H. L. WILLIAMS, APPELLANT, v. AMERICAN EXCHANGE BANK, RESPONDENT.[*]

Kansas City Court of Appeals.   March 1, 1926.

*Corpus Juris-Cyc. References: Appeal and Error, 3CJ, section 1504, p. 1357, n. 48; section 1519, p. 1370, n. 33; 4CJ, section 2613, p. 703, n. 76; section 2834, p. 853, n. 59; section 2952, p. 969, n. 56; Banks and Banking, 7CJ, section 130, p. 527, n. 51; Contracts, 13CJ, section 161, p. 322, n. 66; Trial, 38Cyc p. 1667 n. 85; Usury 39Cyc, p. 888, n. 4; p. 1057, n. 92; Witnesses, 40Cyc, p. 2594, n. 3.

*Bente & Wilson* and *J. T. Montgomery* for appellant.

*Montgomery, Rucker & Hayes* for respondent.

ARNOLD, J.—This action seeks to recover the sum of $2151.99, paid in excess of the principal on a $6000 note and renewals thereof and which plaintiff alleges he was compelled to pay by reason of a usurious transaction.

It is alleged that defendant is a banking corporation doing business at the city of Sedalia, Pettis county, Missouri, and that on November 27, 1916, plaintiff borrowed from defendant the sum of $6000, executing his promissory note therefor, payable on demand, with interest from date at eight per cent per annum; that payments were made on said note from time to time and the remainder of said note as renewed became due on November 27, 1923. On December 18, 1923, defendant demanded from plaintiff and collected the sum of $2750 which was $2151.99 in excess of the principal of said $6000 note and the renewals thereof and eight per cent interest thereon, as contracted

in said notes to be paid, which said sum of $2151.99 was demanded and collected from plaintiff by defendant for the use of the money borrowed as aforesaid. Judgment was prayed for the excess payment with interest at six per cent from December 18, 1923. : :   .

The answer admits the corporate status of defendant as alleged in the petition and that on May 27, 1916, plaintiff borrowed from defendant the sum of $6000 and as evidence of said indebtedness, executed his promissory note therefor at the rate of eight per cent per annum, payable on demand; that partial payments were made on said note from time to time and new notes given for the balance; that the unpaid balance of $2750 on said note, as renewal, became due on November 22, 1923; that on December 18, 1923, defendant demanded and plaintiff paid the said $2750, being the true amount due on said note. As further answer, defendant denies that plaintiff paid the sum of $2151.99, or any other sum in excess of the principal of said $6000 note and eight per cent interest thereon, for the use of the money so borrowed, as aforesaid.

Upon the pleadings thus made the cause went to trial before the court and to a jury. There was a verdict for defendant. A motion for new trial was filed but was overruled and judgment was entered in accordance with the verdict. Plaintiff appeals.

The facts disclosed by the record are as follows: The Wentzelman & Gilman Drug Company, doing business in the city of Sedalia, was on the verge of failure in 1916, chiefly due to disagreement between Wentzelman and Gilman as to the policy of the drug company. The concern owed about $6000 to various creditors, among them the defendant herein which held a note against the drug company for $800. and a note for the sum of $800 signed by Wentzelman and his wife, not an indebtedness of the drug company.

With the acquiescence of its creditors the drug company placed the drug store in the hands of one John J. English, with authority to operate and sell it for the best price obtainable. Mr. English offered the stock for sale and succeeded in securing one bid and that for $3500, which, under advice of the creditors including this defendant. he refused to accept. Thereupon, or soon thereafter, it appears that plaintiff herein became interested in the purchase of the stock. He owned an equity in a farm in Morgan county, Missouri, which he proposed to trade for the stock of drugs. Whereupon he went to the defendant bank and told Mr. Barrett, its president, that he would like to trade the farm to the bank for the drug store, knowing that the bank did not own the drug store.

Defendant's testimony tends to show that Barrett told plaintiff he did not see how the bank could use the farm, but that if he could sell the stock to plaintiff in a way to make the bank whole as to the indebtedness of the drug store and Wentzelman, the bank would sell the drug stock to him. With such a deal in view plaintiff, Barrett and one

Evans went together to Morgan county to inspect the farm. On inspection Barrett was not satisfied with the farm and declined to accept it in exchange for the drug stock. Later, plaintiff talked over with Barrett another plan by which plaintiff hoped to buy the drug store. Barrett testified he knew the stock could be bought for $4500, which was approximately fifty per cent of its appraised, or actual value. It appears that the officers of defendant bank had decided they would buy the stock at $4500 and that in doing so the bank would be made whole as against the two notes of $800 each, above mentioned.

Barrett's testimony is that plaintiff wanted to buy the drug store and was willing to pay $4500 for it and also the two notes of $800 each which the bank held, after crediting upon the drug company's note whatever amount should be paid to the bank in dividends upon the proceeds of the sale of the drug store, upon its claim.

According to Barrett, it was agreed between Barrett and Williams that the bank would not buy the drug store nor bid on it and that Williams would be permitted to purchase it for $4500, provided plaintiff would assume the two $800 notes which would make the bank whole. Barrett's testimony is further to the effect that it was also agreed that plaintiff would organize a new corporation for the operation of the drug store and that the bank would lend plaintiff $6000 upon his note, secured by all the capital stock of the new corporation, with which money plaintiff would buy the store, pay the Wentzelman individual note of $800 and whatever remained unpaid of the $800 drug store note, after all dividends were paid on it. According to Barrett's testimony this was the way in which the deal was consummated. Upon the execution of the $6000 note by plaintiff, that amount passed to the credit of plaintiff upon the books of the bank; that at this time, or soon thereafter, plaintiff gave his check to the trustee, Mr. English, for $4500 in payment for the stock of drugs; and in addition thereto a check for $240 for the purchase of the accounts owing the Wentzelman & Gilman Drug Company and another for $800, in payment of the personal note of Wentzelman and his wife, due the defendant bank.

The testimony of plaintiff is flatly contradictory of that of Barrett in several material respects. He stated he first went to Mr. English, the trustee already referred to, and proposed to trade his Morgan county farm for the drug stock, and that English refused such offer on the ground that he must have cash for the drug stock. Plaintiff testified he then went to defendant bank with a view of borrowing money to purchase the drug stock and fixtures; that he wanted to borrow $7000 in order to have some working capital after paying for the stock, but the bank would lend him only $6000 and told him if he could buy the stock for less, he would have some money for operating the store. With that understanding plaintiff began negotiations with English, the trustee, and finally on November 27, 1916, the stock and

fixtures were purchased for $4500 and the book account for $240; that plaintiff then gave his check to English, drawn on the defendant bank to cover said items. That plaintiff then went to defendant bank and executed his note for $6000, in accordance with the agreement previously made; that when he arrived at the bank and after he had delivered the said checks to English, he was told by Barrett, acting for defendant, "Yes, we will let you have the $6000 on condition that you give us an assignment on the stock of goods as security and a second deed of trust on the Morgan county farm that you own," and that a written contract was then entered into embodying these terms. This contract is fully set forth in the record but as it is not in dispute, it will not be incorporated here.

Plaintiff testified that after preliminary negotiations for the loan had been agreed upon and before the check for $4500 had reached the bank—at least, before it had been paid—Barrett sent for plaintiff and told him that Wentzelman owed the bank $800 personally which was not an indebtedness of the drug company and that plaintiff would have to give him a check for that amount out of the $6000 the bank was lending him, or the bank would not pass the $6000 to his credit; that if plaintiff did not want to do that, the deal would not be consummated; that under the circumstances there was nothing for plaintiff to do but comply; that he was thereby forced to pay the $800 Wentzelman note, receiving nothing therefor, leaving the amount he actually received for his note $5200, instead of $6000.

The record discloses that on March 15, 1917, English, the trustee in charge of the stock, paid the creditors of the drug company from the proceeds of the sale, seventy cents on the dollar, thus leaving the drug company owing defendant bank, $240 on the $800 note which the drug company owed defendant. Plaintiff testified that on that date he was told by Barrett, defendant's president, that he would have to pay the bank whatever amount was due on said $800 note after deducting the credits for dividends, and that if he did not make such payment, the bank would refuse to renew the $6000 note. Plaintiff swore he was thus compelled to pay the additional amount of $240, which made a total of $1040 for which he received nothing in return.

This version of the negotiations as detailed by plaintiff was flatly contradicted by W. H. Barrett, the president, and E. R. Barrett, the cashier, of defendant bank. It is plaintiff's contention that this sum of $1040 was charged him for the use of the $6000 over and above the eight per cent interest specified in the note and the transaction was therefore usurious and that plaintiff is entitled to recover said amount and interest at eight per cent paid on the indebtedness, amounting in total, to $2151.99.

It is defendant's theory that the $1040 paid by plaintiff was not paid for the use of the $6000, but as per agreement with the plaintiff, the consideration being that defendant would refrain from bidding

on the drug stock in an endeavor to save itself from loss, and that this was fully and thoroughly understood by plaintiff.

In addition to the testimony of the two Barretts defendant offered in its behalf the testimony of three witnesses (for which a foundation had been laid) tending to impeach plaintiff, on the ground that his reputation for truth and veracity is bad.

It is charged that defendant's instruction "B" given by the court was erroneous in three respects, (1) that it is misleading for the reason that "it assumes that at the time said stock of goods was purchased for $4500 and the book accounts for $240, said stock of goods could have been purchased for said amount." The instruction is long and it is unnecessary to set it out herein. As we read the instruction, it does not assume the matter charged, but requires the jury to find that fact from the evidence, before it can render a verdict for plaintiff. Furthermore, the testimony of both parties is to the effect that said stock of goods, in fact, was purchased for $4500; and if the instruction had assumed that the stock could have been bought for $4500 it would have assumed a fact that is not disputed but is shown in the evidence given in behalf of both parties. The instruction therefore is not erroneous in that respect.

It is declared, further, that the instruction is misleading because "it does not show that there was any meeting of the board of directors in which any of the officers were instructed to bid on the stock of drugs and fixtures or had any authority to buy said stock of drugs and fixtures." We take this objection to mean that the jury should have been required to find that the board of directors authorized the officers to bid on the stock of drugs. The language of the instruction on this point is as follows: "And if you further find from the evidence that the officers of the American Exchange Bank had decided to buy the said stock of merchandise and fixtures for the purpose of protecting its notes made by said company and by said Wentzelman" etc. As we understand defendant's theory of the case (and the Barretts so testified), it is that their intention was to purchase the stock of drugs personally in order to protect the interests of the bank. In this situation, it cannot be successfully contended that any action of the board of directors was necessary. Even if it had been intended that the bank itself was to make the purchase, the negotiations had not arrived at the point where the consent of the board of directors of the bank was necessary. We think plaintiff's position in this respect untenable.

It is charged also that the instruction is erroneous because it assumes that plaintiff and defendant would be the only bidders for the stock of drugs, but plaintiff fails to point out specifically the offending language in this respect. A careful reading of the instruction fails to reveal any such weakness.

It is declared the court erred in permitting defendant to show all the transactions plaintiff had with defendant bank, outside of the $6000 note relative to which usury was alleged, "in that the court permitted defendant to show every transaction the plaintiff had with said bank, including every deposit that the plaintiff and the H. L. Williams Drug Company made at said bank and also including each and every loan that plaintiff and the H. L. Williams Drug Company had made at defendant bank from the time plaintiff made the first loan of $6000 to the date he paid the last of it off"—that all of this was highly prejudicial and should not have been permitted.

This assignment is too general, not specifying the particular items admitted in evidence now claimed to have been prejudicial. Without such specification, we are not in position to determine whether or not the evidence was admissible. Even though immaterial evidence may have been admitted, it does not necessarily follow that its admission was reversible error. [Pyle v. Light & Power Co., 246 S. W. 979, 987; Wardell v. Ry. Co., 163 Mo. App. 303, 307, 146 S. W. 813.] Furthermore this court cannot be expected to search the record for errors, the existence of which is stated in such general terms. In this connection it is proper to direct attention to our Rule 17, which reads: "The brief on behalf of appellant or plaintiff in error shall distinctly and separately allege the errors committed by the inferior court, and no reference will be permitted in the oral argument to errors not thus specified, nor any reference by either counsel to any authority not cited in his brief, unless for good cause shown the court shall otherwise direct."

It is also charged that "the court erred in permitting defendant to assail plaintiff's character for the reason that it was not put in issue by any pleading filed in the case." This assignment refers to the impeachment of plaintiff who testified for himself. There were three witnesses who had known plaintiff for many years whose testimony was to the effect that plaintiff's reputation for truth and veracity was bad. On cross-examination these witnesses stated in detail the particulars from which they testified; and if the testimony developed on cross-examination tended to the disparagement of plaintiff's general reputation, it cannot be charged as error. It will not be denied that it is elementary law that every witness is subject to impeachment, the proper foundation therefor having been laid, as was done here. [State v. Baker, 209 Mo. 444, 108 S. W. 6; State v. Dyer, 139 Mo. 199, 40 S. W. 768; State v. Ragsdale, 59 Mo. App. 590.] We therefore rule against plaintiff on this point.

It is understood that the issue in this case is whether usurious interest was actually charged for the use of the $6000, over and above the eight per cent mentioned in the note, it being plaintiff's contention that the $1040 mentioned in the pleadings was, in fact, interest for the use of the money. Usury is defined as "the excess over the legal rate

charged to a borrower for the use of money.'' [Bouvier's Law Dict., Vol. 3, p. 3380; McRackan v. Bank, 80 S. E. (N. C.) 184.] Defendant's contention is that the amount was paid pursuant to a contract, the consideration for which was that defendant should refrain from bidding on the stock of drugs. This has been held to be a good consideration. [White v. McMath (Tenn.), 156 S. W. 470; Hughes v. Foltz, 142 Mo. App. 513, 127 S. W. 112.]

Substantial testimony was introduced by defendant and while testimony introduced by plaintiff was, in some instances, flatly contradictory thereof, the facts were before the jury for its wise determination. The jury has spoken on this point and we are not authorized to disturb its finding. Finding no reversible error of record, we affirm the judgment. It is so ordered. *Bland, J.,* concurs; *Trimble, P. J.,* absent.