Elvira Spangler-Bowers, Defendant in Error, v. Frank Benton et al., Plaintiffs in Error.—83 S. W. (2d) 170.

Kansas City Court of Appeals. March 4, 1935.

*Charles N. Sadler* and *Ed A. Harris* for defendant in error.

*Thurman L. McCormick* and *Wm. Walter Brady* for plaintiffs in error.

TRIMBLE, J.—This case is here on a writ of error sued out by defendants in the trial court to recover a judgment rendered upon a verdict of the jury in favor of plaintiff assessing $1500 actual and $250 punitive damages.

The case, as now presented, was set for hearing in the appellate court on Friday, December 7, 1934, and argued and submitted on that day. On November 16, 1934, the abstract and brief of plaintiffs in error were, under our Rule 15, duly served on defendant in error twenty days before the case was set and the required number of copies thereof were filed in this court on November 20, 1934, and defendant in error served on plaintiffs in error copy of her brief, points and authorities, together with her "additional abstract" on the opposite parties on the 28th of November, 1934; so that the abstracts and briefs of both sides were served and filed in proper time for this presentation on writ of error.

The defendant in error raises the point that "the bill of exceptions was not filed within the time provided by law and, hence, there is nothing before this court except the record proper." The abstract of the plaintiffs in error shows that the bill of exceptions was filed on July 21, 1934.

Since the Act of 1911 (Session Acts 1911, p. 139) amendatory of the statute (now Section 1009, Revised Statutes of Missouri, 1929), it has been sufficient to file the bill of exceptions at any time before the abstract of record in this case on writ of error is required to be filed. It is conceded that the Supreme Court has held that said Act of 1911 applies to cases on writ of error as well as to those on appeal. Moreover, our Rule 15 provides that in case "respondent or defendant in error desires to question the sufficiency of . . . plaintiff in error's abstract of the record because it fails to show . . . that the bill of exceptions *was duly signed or filed*, . . . such objections and the reasons therefor shall be served in writing on . . . plaintiff in error, or his counsel, ten days before the day on which the case is docketed for hearing or within ten days after the abstract is served. Any such objections not so specified shall be deemed waived and will not be considered by the court." No such motion or objections were ever filed at any time, and even the objection raised for the first time in the brief of defendant in error was not served until after the ten days required by our Rule 15 had expired. Under said Rule 15 the objection or point must be deemed to have been waived and cannot be considered.

After the case was heard on December 7, 1934, at the close of the argument, the court allowed plaintiffs in error fifteen days in which to file reply briefs and they were filed within that time. On January 5, 1935, some fifteen days or more after the reply briefs were filed, defendant in error filed motion to strike out said reply briefs on

the ground that such briefs have made *new* assignments of error not contained in the original brief.

An examination of the original briefs filed by plaintiffs in error and a comparison thereof with the reply briefs filed by them, leads to the conclusion that no *effective* assignments of error or points have been raised in said reply brief that were not in fact raised in the original brief. Some of them may be, perhaps, subdivided and stated with more particularity than in the original brief, and some are in answer to matters raised in the briefs and argument of defendant in error. No complaint was made in the brief of defendant in error that any point raised in the original briefs of plaintiffs in error was insufficient to call the court's ruling thereon, or not plainly enough made to afford defendant in error an idea of what the point raised was about. And while the court reserves to itself the right to disregard any point so insufficiently, or so generally, stated that it cannot be known what is the point raised or complained of except by patient investigation and careful study of the record, yet the only penalty expressly provided in Rule 17 (except possibly Rule 18) for lack of definiteness or specification in an assignment of error, is that "no reference will be permitted in the oral argument to errors not thus (distinctly) specific." The motion to strike out the reply brief is overruled, and likewise the motion of plaintiffs in error to strike out the motion of defendant in error attacking the reply brief, is also overruled. After thus spending a few moments in disposing of the preliminary fencing of the opposing combatants, we proceed now to consider and to dispose of the real fight between them.

The action is one for damages for an alleged assault on plaintiff at her home, charged to have been made violently and maliciously by defendant, Benton, while performing his work as agent for his codefendant, the Singer Sewing Machine Company, a corporation, in seeking to obtain, and obtaining, the immediate delivery of a sewing machine to them which had been delivered to plaintiff's home and placed in her charge. The case was, at all times, tried on an amended petition filed December 10, 1928, in the Circuit Court of Jackson County, Missouri, at Independence. The abstract of plaintiffs in error discloses *no record,* or statement as a part of the abstract, of any trial of the case or judgment rendered therein at Independence on February 13, 1931, or at any other time. The *"additional"* abstract filed by defendant in error (plaintiff in the case) shows only that on December 5, 1932, the defendant Singer Sewing Machine Company applied for, and the sixth obtained, a change of venue from the judge of the Independence Division of said court and the cause was, on said last named date, sent to Division No. 9 of said court at Kansas City in said county. Said additional abstract next shows a record of an order in Division No. 9, made December 15,

1932, reciting that a jury in said cause after retiring to further consider of their verdict and after due deliberation, reported into court that they were unable to agree, whereupon they were discharged.

The amended petition shown in the abstract of plaintiffs in error (defendants in the trial court) alleges:

That plaintiff therein purchased of the defendant Singer Sewing Machine Company, a corporation, a sewing machine which had been delivered to her home and placed in her charge; that on or about June 5, 1927, said defendant, through its agent and employee, the defendant, Frank Benton, caused said Benton "to come to plaintiff's home and make demand for the delivery of said sewing machine to their immediate possession;" that plaintiff remonstrated with said Benton about delivering said machine, whereupon said Benton, for himself and in behalf of the said corporation, "became insistent that the plaintiff comply with his request for the delivery of said machine and did thereupon place his weight against plaintiff's door and did wrongfully overpower the plaintiff and did wrongfully and with force and violence enter plaintiff's home against her protests and took possession of said machine and began dragging it from plaintiff's home. That in entering plaintiff's home the said defendant, Frank Benton, caused the door thereof through which he passed to come in violent contact with plaintiff's body and caused plaintiff's body to be struck with great force and violence; that during said time Frank Benton did curse and abuse the plaintiff and did address himself to the plaintiff in a loud and boisterous manner, and did exhibit great anger and hatred toward the plaintiff; that plaintiff was helpless in said situation, being alone at the time; that the defendant, Frank Benton, was a strong and able-bodied man, and plaintiff was powerless against the strength of defendant, Frank Benton; that during said occurrence the said Frank Benton did repeatedly threaten plaintiff with arrest, and plaintiff was greatly excited and put in great fear of her safety; that plaintiff thereupon became violently ill; she at said time being in an advanced stage of pregnancy; and did become greatly excited and did thereupon experience great physical pain and mental anguish; that shortly after the defendant, Frank Benton, left her home, she began suffering from a vaginal hemorrhage and did suffer great physical pain and mental anguish and she did thereafter continue to suffer from said vaginal hemorrhage and did thereafter as a direct result of the wrong complained of suffer a miscarriage of the fetus she was carrying; that she did lose much blood and she did suffer much pain and mental anguish.

"Plaintiff further states that because of said conduct on the part of the defendants she did thereafter lose much of her natural rest and sleep, and was rendered extremely nervous, melancholy and sad.

"That plaintiff was actually damaged in the sum of ten thousand ($10,000) dollars.

"Wherefore, because of the foregoing facts plaintiff prays judgment against the defendants in the sum of $10,000."

And the petition further stated "that because the conduct of the defendant was willful, wanton and malicious, plaintiff prays punitive and exemplary damages in the sum of $10,000."

Defendants' joint and separate amended answer set up that the said Singer Sewing Machine Company, through its agent Weaver, in June 1, 1927, sold and delivered to plaintiff the sewing machine in question. That—

"Thereafter by reason of plaintiff's failure and refusal to comply with the terms of said sale and to verify the purchase thereof on form required by defendant corporation, an effort was made to secure the return of said machine; that plaintiff herein did voluntarily deliver said machine to the agent of defendant corporation; that subsequent to the delivery of said machine to defendant corporation and in pursuance of an agreement, scheme, arrangement and conspiracy made and entered into by and between the plaintiff and said Weaver, suit was instituted against the defendant corporation, based upon a pretended claim of insult and assault alleged to have been committed by Frank Benton, the agent of defendant corporation, on or about June 3, 1927, at the time said machine was delivered by the plaintiff herein to said agent of defendant corporation.

"Defendant further states that plaintiff and the said Weaver had been acquainted for many months prior to June 1, 1927; that said Weaver frequently called at the home of the plaintiff at 8314 Independence Road and had frequently been in her home prior to the time that plaintiff moved to 8314 Independence Road; that plaintiff and said Weaver entered into the aforesaid conspiracy to defraud this defendant by bringing suit against the defendant herein on a pretended and fictitious claim of assault and injury claimed to have been produced by Frank Benton; that said conspiracy between plaintiff and Weaver was entered into shortly after defendant company discharged the said Weaver, agent of defendant corporation; that in carrying out said conspiracy and scheme the said Weaver took the plaintiff herein to the office of an attorney in Kansas City, Missouri; that it was there arranged that plaintiff would claim to have been injured by the agent of defendant corporation by having had a door shoved against her in such a manner as to have brought about a miscarriage.

". . . in truth and in fact the plaintiff herein had prior to the month of June, 1927, by the taking of quinine, ergot, sulphur and whiskey endeavored to bring about and produce a miscarriage; that in truth and in fact the plaintiff herein had on several occasions prior

to 1927 suffered a miscarriage and that plaintiff herein has since the year 1927 had another miscarriage; that in truth and in fact the miscarriage which the plaintiff herein did suffer during the month of June, 1927, was wholly and entirely produced and brought about as a result of the desire and determination on the part of the plaintiff to be relieved of her then pregnant condition; that said miscarriage was in truth and in fact produced and brought about by the medicine taken and the physical means used and applied by the plaintiff herein to bring about and produce said miscarriage.

''The said Weaver upon being discharged by the defendant, Singer Sewing Machine Company, conspired with the plaintiff and aided and encouraged her in bringing said suit against defendant corporation and accompanied her to a lawyer's office for the purpose of securing his services to represent plaintiff herein; that as a part of said arrangement and conspiracy it was agreed by the said Weaver to give plaintiff all the aid in his power to prosecute said suit; that plaintiff agreed to give said Weaver one-half of whatever sum she realized from the same; that said suit is wholly and entirely the result of a scheme, arrangement and conspiracy made and entered into on the part of plaintiff and said Weaver to collect damages from defendant corporation for pretended injuries which in truth and in fact were nonexistent.''

Said answers also set up that ''the cause of action attempted to be alleged and stated in plaintiff's petition filed herein is *res adjudicata* and barred by reason of the fact that this cause was tried and judgment therein rendered in the Circuit Court of Jackson County, Missouri, at Independence, on February 13, 1931;'' which judgment, *so said answer recites,* was rendered in the Circuit Court of Jackson County, Missouri, at Independence, on February 13, 1931, wherein the jury returned the following verdict:

''2/13/31, we, the jury, finding the issue in favor of the plaintiff against the following defendants, the Singer Sewing Machine Company, and assess plaintiff's actual damages in the sum of $1500 and further assess punitive damages in favor of the plaintiff in the sum of $1500.''

on which, it was ordered and adjudged by the court ''that the plaintiff have and recover nothing as against the defendant, Frank Benton; that the plaintiff have and recover of and from said defendant, Singer Sewing Machine Company, the sum of $1500 actual damages, and the further sum of $1500 punitive damages, making an aggregate amount of $3000, with interest thereon from this day until paid at the rate of six per cent per annum, together with all costs herein and have therefor execution.''

Said answer further set up by defendant Singer Sewing Machine Company that no motion for a new trial or in arrest was filed by

defendant, Frank Benton, and no action was taken by plaintiff to appeal from said judgment or to set aside, modify, vary or change said judgment in any way; that said judgment in favor of Frank Benton is a final judgment; that, as a result of said final judgment in favor of Frank Benton, the defendant Singer Sewing Machine Company "is completely relieved of any and all liability in the cause of action attempted to be alleged" in plaintiff's petition "and said defendant Singer Sewing Machine Company specifically pleads the aforesaid judgment in favor of said Frank Benton in bar of any and all rights against defendant Singer Sewing Machine Company. Wherefore, both defendants ask to be discharged."

Plaintiff's reply was a general denial of "each and every allegation of new matter in said amended answer contained."

Afterwards said Singer Sewing Machine Company filed a motion to dismiss the above entitled cause on the ground that the cause was heretofore tried at Independence on February 13, 1931, on the charge of negligence of Frank Benton in causing plaintiff's alleged injury, and said trial resulted in a judgment that plaintiff "recover nothing as against the defendant Frank Benton" and that plaintiff recover $1500 actual and $1500 punitive damages of the Singer Sewing Machine Company.

Said motion also states, as a part of the grounds thereof, that no motion for new trial and in arrest were filed in behalf of either Singer Sewing Machine Company or defendant Benton or plaintiff; that said judgment is, therefore, final and conclusive and since Frank Benton has been adjudicated to be without liability, this releases the Singer Sewing Machine Company.

Said motion to dismiss was considered in Division 9 of said court and overruled, defendant, Singer Sewing Machine Company, excepting.

The abstract of plaintiffs in error next shows that a motion for new trial was filed by the Singer Sewing Machine Company, and that on April 15, 1932, it being a part of the March term, 1932, "by agreement of the parties hereto in open court (italics mine) said motion was sustained and that "the judgment rendered in the cause be and the same is hereby set aside and for naught held and cause reinstated on the docket of this court."

The said abstract of record next shows that on January 3, 1933, the case was tried in Division No. 3 before Hon. THOMAS J. SEE-HORN and a jury, resulting in a judgment, on January 5, 1933, against both defendants for $1500 actual damages and $250 punitive damages. From this, both defendants appealed. The appeal was filed in the appellate court on September 14, 1933, and set for hearing therein on April 2, 1934. On April 2, 1934, on respondents' motion, the appeal was dismissed for failure of appellants to serve abstract and briefs.

Thereafter, on May 9, 1934, a writ of error was sued out and, as heretofore stated, set for hearing in this court on December 7, 1934.

Point is raised by plaintiffs in error that the court erred in not sustaining their objection to the introduction of any evidence, and also in failing and refusing to dismiss the case. The basis of both these points is that the alleged judgment at Independence, on February 13, 1931, was, in effect, a finding and judgment for defendant Benton, and he being the person who is charged to have inflicted the injury sued for as agent of his codefendant, the Singer Sewing Machine Company, the latter cannot be held liable, since exoneration of the agent who is charged to have committed the alleged wrong, exonerates his principal. We have no desire to controvert this well-established principle. But the trouble is the *record* does not disclose any such judgment of exoneration, as has been heretofore stated hereinabove. The only place where anything of the sort appears is in the defendant, Singer Sewing Machine Company's "motion to dismiss." But a statement in a pleading does not prove itself. The *record* should show the fact. The action of the court on the motion to dismiss does not prove nor even impliedly concede, that there was such a judgment. The action of the court is rather to the contrary, since it *overruled* the motion to dismiss.

Furthermore, the record shows that, within four days after the rendition of a judgment (not stated what judgment), a motion for new trial was filed at Independence and that later said motion was, "*by agreement of the parties hereto in open court,*" *sustained* and a new trial granted. No appeal was taken from the order sustaining the motion for new trial, the term has long since passed, and it therefore became final, and cannot be collaterally attacked. [State ex rel. v. Carroll, 44 S. W. (2d) 1105; Liberty Central Trust Co. v. Roy, 245 S. W. 1085, 1086, 1087; State ex rel. v. Trimble, 277 S. W. 916.] Again, if such judgment at Independence was rendered, it appears from the motion to dismiss, i. e., by the pleading filed by plaintiffs in error themselves, since the verdict as thus shown is incomplete and defective in that it finds the issue in favor of plaintiff and against the *defendants* and then recites the name of but one defendant. It is well settled that the verdict is the basis, and the only basis, for the judgment. [Singleton v. Kansas City Baseball, etc., Co., 157 S. W. 964.] The verdict, as shown by the motion, did not dispose of all the issues, and therefore was not sufficient to sustain the judgment, if any, rendered thereon, and, as stated, it was, by agreement of all the parties, set aside. [Proctor v. Garmon, 218 S. W. 910, 911; Miller v. Bryden, 34 Mo. App. 602, 608, 609; Fenwick v. Logan, 1 Mo. (Reprint) 223.] The claimed verdict was void and could be collaterally attacked. [Abernathy v. Missouri Pacific Ry. Co., 228 S. W. 486, 487; Crow v. Crow, 124 Mo. App. 124, 125.]

It is next urged that the petition states no cause of action. We have heretofore set out the various allegations of the petition which, we think, show that the point is not well taken. No attack was made on the petition on this ground in the trial court, save an objection to any evidence thereunder made before the taking of evidence began and after answer had been filed. The petition certainly stated facts showing that an assault and battery was wilfully and intentionally committed even though those particular or precise words were not used in the first portion thereof, and the petition, even though perhaps somewhat inartistically drawn, was good as against an oral objection to the introduction of any evidence.

It is next contended that the demurrer to the evidence offered by defendants should have been sustained because there was a complete failure of proof.

The record discloses evidence in behalf of plaintiff tending to show:

That plaintiff about June 1, 1927, when negotiations were made and concluded with defendant Singer Sewing Machine Company for the purchase by, and delivery to, plaintiff of the sewing machine in question, she was living with her four children and her husband, James Spangler, but that since that time the couple had been divorced and she was not (at the time of the trial, January 3, 1933) married to Mr. Bowers; that a contract (evidently a note and chattel mortgage on the sewing machine) for $91 less a $5 payment made by her on it, bearing the papers calling for $86, were brought out to her for confirmation by the company's agent, Frank Benton; that she had signed said papers on June 1, 1927, using her then husband's name, James Spangler; that the morning of June 3, 1927, Benton brought out to her a "verification slip" acknowledging the trade in reference to the machine and that she likewise signed it using the name of her husband, James Spangler; that everything was pleasant when Benton was there in the forenoon. The machine, which had been delivered on June 1, 1927, the same day it was contracted for, was there; Benton saw it, there was no demand made by Benton at that time, and their relations were pleasant; that Benton, for some reason, came back to plaintiff's residence that afternoon.

That, at that time, plaintiff was ready to take a bath and had one foot in the tub, with the doors and windows closed and the blinds and shades pulled down and the children asleep; that at this moment she heard some one pounding on the glass of the front door; that she asked who was there and the knocker "mumbled something" and plaintiff again asked who was there and could he wait? The man answered he was Mr. Benton of the Singer Sewing Machine Company. Plaintiff asked him if he could wait; that she was taking a bath and had to get some clothes on. Plaintiff testified that he said he wouldn't. Plaintiff says she grabbed a bath robe, and step-

ping further into the room, again told him of her situation and asked him if he could wait. Benton replied, "I want $5 more or I have to have that machine." Plaintiff says she asked him if he might see her husband—

"And he cussed and roared something terrible and kept hammering on the door and talked as if he didn't want to see my husband; he had to have $5 on that machine. . . . I moved up to a few feet of the door, raised up the little curtain and shade to look just enough to see if it was him, and it was, and he just kept hammering and cussing and roaring, and said he just had to have the machine and he was going to get it.

"Q. Proceed. What happened then? A. Well, just as I stepped up to the door and was talking to him, a few feet from the door, he took hold of the door knob and forced himself in and come right in the house; forced himself in the house. The knob struck me in the abdomen and I fell on the day bed.

"Q. When he threw the door open, did any part of his body come in the house? A. Yes, one foot and head and shoulders, practically all of his body.

"Q. Stand up and show the position that Mr. Benton assumed. A. He took hold of the knob, and his whole body came in; he just shoved the door right in on me.

"Q. What effect did it have on you when the door swung around and struck you? A. The knob struck me in the abdomen and knocked me back and a severe pain struck me.

"Q. I mean, did it move your body when the door struck you? A. Yes, sir, it threw me back.

"Q. What threw you back? A. The door.

"Q. You mean the force of the door? A. The force, the way it throwed me back onto the day bed.

"Q. Where in the stomach did the knob of the door strike you? A. Right below the navel, that part of my abdomen.

"Q. Did you make any outcry when you were back against the day bed? A. Yes, sir, I almost lost the coat; I had my robe on, and it left me there, you might say, naked, and I let out a scream and he stepped back then, kind of, and said, 'Well, if I can't have it, I will get the machine, and if I can't have it, I will get the policeman.'

"Q. Did he gaze upon you while you were in that position there? A. Yes, sir, just stood there and gazed at me.

"Q. Immediately, when you screamed— A. (interrupting) He stopped long enough to get the conversation in that he would get the policeman and come after me.

"Q. All right. Did he then move from there after he made that? A. Yes.

"Q. Where did he go? A. When he said he was going to get the policeman, he went back across the street and went in over there to a barbecue stand.

"Q. That is Mr. Miller's place? A. Mr. Miller's place, yes, sir.

"Q. And what did he do then? A. I went back and got dressed and put clothes on underneath my bathrobe.

"Q. Where were the children at that time? A. They were all crying and screaming and awake.

"Q. What did you do, make any more noise. A. Well, I couldn't keep from crying, and I was in terrible pain.

"Q. All right, now, after you saw that he went across over there just go ahead and tell the jury what next you did, if anything. A. I happened to think how that would be if he would bring a lot of policemen in there and get it.

"MR. McCORMICK: Just a moment. I object to this statement as to what she thought about it.

"THE COURT: Yes, that is argumentative. State what you did.

"Q. (BY MR. HARRIS) I say, what did you do? A. I didn't want any policemen in there. . I pulled the machine up before the door there and watched to see if he would come back and there was a little child playing in the street and I called her and asked her to get the man.

"Q. Did you dress before that? A. I put the dress on underneath my robe then.

"Q. About where did you pull your machine with reference to the door? A. I could give it the least little shove—it wasn't very far from the door.

"Q. Now, after you sent this little girl who was playing out in the yard over to Mr. Miller's barbecue stand, across the street, what then did you see, did you see Mr. Benton there any more after that? A. Yes, he came back when the little girl went after him. He came back and rapped on the door and I opened it and he had taken the machine out.

"Q. Was any part of his body in at that time?

"Q. Did he come in the house? A. No, he reached in and pulled the machine out.

"Q. Was any part of his body in at that time? A. Just one foot and head and shoulders to reach the machine.

"Q. He didn't come clear in, he had one foot on the door sill there? A. The door sill, I guess you call it.

"Q. Now, when he pulled the machine out, did you say anything to him or ask him for anything at that time? A. Yes, I asked him for the paper. I didn't want to pay for something I didn't have.

"Q. What paper? A. I had in mind those papers there.

"Q. This contract and verification slip? A. I asked him if I might have them, yes, sir.

"Q. What did he say? A. He didn't say anything. He pulled the machine out and mumbled something; snatched them out of the billfold and threw them on the porch at me.

"Q. Outside or inside? A. Outside.

"Q. When you picked them up, was that piece (indicating) gone? A. I never did see that piece no more; that piece was out.

"Q. You never saw that any more? A. No, sir; I never seen that piece no more. . . .

" 'Q. And when Mr. Benton threw this contract and verification slip on your porch, as you have just described—did he throw the $5 that you have—

" 'Q. MR. McCORMICK (interrupting): Now, just a minute, I object to that and ask that it be stricken out. There is no question here in respect to the $5 whatever.

" 'THE COURT: It will be overruled.

" ' (To which ruling and action of the court, the defendants, by their counsel, at the time duly excepted and still except.)

" 'A. No, sir.

" 'Q. (By MR. HARRIS) Now, you described awhile ago that you felt pain when this door struck you there, just tell the jury here as to your condition, whether you were pregnant or not at that time? A. Yes, sir, I was.

" 'Q. About degree of pregnancy, how far advanced was it? A. About four and a half or six months, I don't remember.

" 'Q. Some place between four and a half and six months? A. Some place between four and a half and six months.

" 'Q. Now, after Mr. Benton took the machine out of the house, as you described, what then did you do, if anything? You said the babies were crying and you were crying. What did you do?

" 'MR. McCORMICK: I object to repetition of those statements here.

" 'THE COURT: Those remarks, of course, are unnecessary. Proceed.

" ' (To which ruling and action of the court, the defendants, by their counsel, at the time duly excepted and still except.)

" 'MR. HARRIS: Proceed.

" 'A. I went in and lie down and tried to quiet the children and myself too. I was hardly in a shape to quiet the children. I was crying myself and I was trying to quiet us all. I was in such severe pain.' ''

That she (plaintiff) went into the bedroom and laid on the bed with the children; that she laid down the rest of the afternoon; that the pain was in the lower part of the abdomen; that she began

menstruating and had severe headaches and pain and was nervous; that her husband was not home at the time; that he arrived home in the evening; that he came home for supper that night and fixed supper for the children and himself; that the plaintiff laid down all the time trying to quiet herself; that she had no medical attention that night; that her husband was up and down all night trying to do something for her; that her husband wanted to get a doctor she was in such misery but they were not fixed for it at home and she thought she could get better and she told her husband she would go down in the morning if she felt better.

Witness then testified concerning her consulting the doctor and of taking medicine he gave her.

That she had continual pains and was flowing and menstruating at that time; kept getting weaker and was hardly able to walk; that the hemorrhages continued and got worse; that her husband called Dr. Callaghan on June 10th; that the doctor gave her a prescription; told her to lie quiet, which she did; that she did not get any better after June 10th and on the night of June 18th her husband called Dr. Callaghan again but he was sick and he told her husband to call an ambulance from the General Hospital, which he did, and she arrived in the hospital on the nineteenth, as it was after twelve o'clock that she arrived at the hospital, about one or two o'clock, and that twenty-four hours later she had a miscarriage; she remained at the hospital about a week and was then sent home; the advice given to her that "rest was about the only thing it could do;" but about a month later she had to go back to the hospital again; that her ill health continued.

Plaintiff denied taking anything to produce a miscarriage; that in her talks with any of the physicians she never told them of the injury she suffered through the acts of Frank Benton but testified that: "He knocked the door knob against me—he hurt me with that." She told her husband about it that night when he came home. She further testified that the births prior to the miscarriage were natural births; that at the time of the trial she was twenty-nine years old; that when she went to the hospital after the assault by Benton, she did not talk to the doctor; as he "seemed to know what was the matter with me;" that when she went back to the hospital the second time, July 19, 1927, she thought Dr. Hook attended her; that it was when she went to the hospital in 1928, she thinks she talked to Dr. Ralph Myers, and that she told him she was having chills and fever ever since her first miscarriage, the one in suit, irregularity in her periods; that up to that time she had had no trouble either in childbirth or from vaginal discharge or miscarriage which she did have after the injury complained of in this suit. She also denied that she suffered pain to the date complained

of, had never met or known Frank Weaver, the man who, in behalf of the company, called and made a contract for the purchase of the sewing machine and who told her that another agent would be around to "verify" the sale. (This was Benton, who did call in the forenoon of the day of her injury as heretofore stated.) That she bought the machine and when Mr. Benton came to her home in the morning of the day of her injury and brought the verification slip, she signed it. That in the afternoon when the trouble occurred about the delivery of the machine back to him and he left to go across the street, she thought he was going to call a policeman and she then got a little girl to tell him to come back and get the machine and when he had gotten it out on the porch she asked him to return her the papers she had signed and he threw them on the porch floor.

She denied that she had ever taken quinine, ergot or anything to cause a miscarriage.

Medical testimony was introduced in plaintiff's behalf, and a physician who had professionally attended her for ten years, testified that he had been with her in three confinements when her children were born; that they were natural, normal births, without the use of instruments, and the confinements were at home and not at the hospital; that he saw plaintiff about June 10, 1927, she was about five months pregnant, she was having, not a menstrual condition but a "flowing condition threatening miscarriage;" that he did not see her after June 10th for a long time, not at all the last six months; that he was called and suggested that she be sent to the hospital; that her general condition of health, for several years prior to the 10th of June, was good.

He further testified that a traumatism or injury can cause a miscarriage, that oftentimes it is injurious. He also testified that—

"That a miscarriage is more or less infectious and irritation sets up in the pelvic organs; that once infection is started it spreads to other organs rapidly, including tubes, ovaries and peritoneum; that it affects the Falliopian tubes with inflammation and sometimes abscesses.

" 'Q. Is it ever necessary, as a result of this, to remove the tubes or ovaries? A. Oh, yes.

" 'Q. Doctor, after a woman has had a miscarriage, does it ever so impair the functions of her puberal organs that it is impossible for her to carry a subsequent or later child? A. It may.

" 'Mr. McCormick: I object to that. I think it is improper here to be dealing in the realms of possibility. The questions are all directed as to what might possibly happen. The question before this court is what, if anything, resulted in this case?

" 'The Court: Let him answer.

" '(To which ruling and action of the court, the defendants, by their counsel, at the time duly excepted and still except.)

" 'A. It often does.

" 'Q. (By Mr. Harris) So that a woman who has one miscarriage is more often or more liable to miscarry again than a woman who has not miscarried before? A. Absolutely.' "

He also testified that any injury would cause a premature birth, a seven-months' baby. "Sometimes great fright would cause it, anything that would shock the system seriously might cause it," that the existence of diseased conditions claimed by plaintiffs in error—

"Would not offer a proper explanation for the miscarriage of plaintiff in 1927, because she had been pregnant in the meantime; that during the time that a woman is pregnant it would not be likely for her to have a red, bloody discharge unless the pregnancy is removed; that with these irregular conditions, bloody discharge and fever, a woman wouldn't be so likely to become pregnant; that the conditions referred to might be produced by a misplacement of the womb; that the conditions referred to might tend to indicate a misplacement of the womb; that after the birth of each of Mrs. Spangler's children he kept in touch with her for a few days; that it was a little over a year from the birth of the last child when he was consulted by Mrs. Spangler in 1927; the last baby was born in 1926."

That he was not certain whether the birth of the last child was in 1926 as he had stated; it might have been in 1925; that he knew the General Hospital gave free service and attention to plaintiff in 1927; she needed hospitalization.

A neighbor, Callie Bates, testified she had known plaintiff around seventeen years; she saw her about three or four times a week, she visited at her home, and plaintiff visited at witness' home; that prior to June, 1927, "she looked well and strong; that she was quick in her movement and actions; that she did her own housework; that she helped a lot of times; that she never knew of her having a miscarriage prior to that time; that witness had noticed a change in her condition today from what it was prior to June, 1927. "She is just simply a wreck to what she used to be. Her health has gone to nothing."

She testified on cross-examination that she hadn't seen her so much in the last month or two months; that she saw her once or twice a month, sometimes three times; that she had never testified in this case before, the reason being that "she had never been requested to come."

Another physican, a witness in plaintiff's behalf, testified that he had examined plaintiff in December, 1932, and found that a surgical operation of some kind had been performed in the abdominal cavity,

"the uterus was fixed or what is sometimes called a 'frozen uterus.'" In answer to a hypothetical question, assuming the matters claimed in her testimony to have happened June 3, 1927, at her home when defendant Frank Benton was present, and assuming—

"That said Benton, instead of waiting until she dressed, without telling her he was going to open the door, pushed same around so that the knob of the door struck her on the abdomen just below the navel with such force that it knocked her backward on a day bed standing a short distance behind her; that when she fell her kimono or bathrobe came open, exposing her person; that before she could get up or arrange her bathrobe or kimono, said Benton started to come in the room and she screamed, whereupon he turned and left, threatening to call the police; that at that time she was about four to six months pregnant; that she suffered intense pain in her abdomen at the time and about three hours afterwards a bloody discharge started from her vagina; that she consulted doctors who prescribed for her once or twice; that the pains and discharge continued up to about midnight on June the 18th, at which time the pains became so severe that she was taken to the General Hospital in an ambulance and within a day or two suffered a miscarriage."

He was asked whether or not in his opinion the blow she received as detailed above could have caused the miscarriage of which she complains, his answer was—

"Yes, I think it could. Trauma to the abdominal cavity could be a very salient feature to produce a miscarriage or abortion, yes."

In a hypothetical question embodying as assumptions the facts stated therein as to what is claimed to have occurred and of her condition after she left the hospital but was compelled a month later to return to the hospital but was not well when she left the hospital, and thereafter became pregnant until again she had a miscarriage on or about February 27, 1928, and assuming further that she had never suffered a miscarriage prior to the one heretofore mentioned, the physician was asked whether, in his opinion, the second miscarriage could have been caused by the blow heretofore mentioned together with the attending results heretofore mentioned? He answered—

"The first miscarriage has a tendency to make an irritable uterus and the conditions that often follow it. Infections, inflammations have a tendency to super-index (induce) a second pregnancy. The first blow, of course, directly caused the first miscarriage, not directly the second directly. By indirect implication it might have to do with the second by producing either an inflammatory condition in the uterus proper or a condition in the tubes in which there would be an unstable or unsettled condition of the uterus as an organ. Miscarriages themselves, when perfect, if they could be called per-

fect, because they are not physiological process, even then they have a tendency to disturb the normal balance of the uterus. They do not make for a healthy secondary confinement or pregnancy.''

In a hypothetical question which assumed all the matters detailed in both the last question and—

''Assuming further that after the miscarriage she continued to suffer severe pains or cramps in her abdomen and had a discharge which grew worse up until about the middle of June, 1928, when the same became so severe she had to go to a hospital and be operated upon, at which time it was found necessary to remove one ovary and both Falliopian tubes; assume further that she had suffered no injury or disease since the one mentioned and prior to said injury had never had any trouble with her ovaries or tubes; (he was asked to) state whether or not in your opinion the pains she had and the necessity for the removal of said organs could have been caused by the blow which I have described and the results which followed therefrom as detailed in these questions,'' he replied—

''Yes, it could follow as a consequence of the blow and the consequence of it brought on by the blow, the miscarriage could be a factor in the producing the tubal abscesses, tubal infections and is one of the causes of removal of the tubes. It is one of the very prominent causes of salpingitis, which is inflammation of the tubes.''

He was further asked:

''Doctor, assuming all the facts detailed in the last three questions, assuming further that she had been nervous and suffered with pains in her abdomen and had irregular menstrual periods and assuming further that she had not been injured or had any disease during the said time other than that detailed by me heretofore, tell the jury whether or not, in your opinion, as a physician, her present condition as just detailed could have been caused by the blow which I have described and the results flowing therefrom.''

He replied:

''Yes, it could directly come from it. First, she had the blow with the partial miscarriage followed by the more protracted period, then the retaining of the placenta or residual tissues, secondary involvement of the tubes and naturally an operation which would show today a condition of the uterus which I found, that is, lineal scar down the abdomen as a result of the opening of the abdominal cavity and also a fixed uterus. Yes, it could flow as from the conditions, it could flow as a case of straight evidence through that.''

He was also asked to state whether or not in his opinion her present condition is reasonably certain to be permanent. He replied:

''Of course, the permanent condition I suppose means in reference to the pelvic organs, the main part of it. Of course, it is permanent; it is gone. Some part of it is gone, of course, and the rest

of it is in a condition that naturally does occur from certain conditions. It will stay just as it is now, yes. The condition of the pelvic organs will remain as they are now.''

Plaintiff, being recalled for further cross-examination by defendant, testified:

''That she had testified that from 1927 on she felt very badly and hadn't felt well any of the time; that she felt better occasionally three or four days or a week but that it didn't last any length of time; that she was divorced from Mr. Spangler December 2, 1930; and she married Mr. Bowers in March, 1931; that she felt good enough during this period to get a divorce and remarry; that when Mr. Benton came to her house in the afternoon of June 3, she was ready to step in the bathtub in the house, in the kitchen; that she heard Benton pounding on the glass; that the door had glass in the upper part of it; that when she heard him rap she didn't go to the door; that she asked him who was there; that he said who he was and that he was from the Singer Sewing Machine Company; that she didn't go to the door; that she grabbed up a bathrobe, slipped it on and stepped close to the door and asked him to wait.

'' 'Q. How close did you get to the door at any time during the time he was there on the porch? A. Oh, I would say a couple of feet, something like that. I never exactly measured it.

'' 'Q. And I believe you said this bathrobe that you speak of didn't have any fastening on? A. No, sir; it didn't.

'' 'Q. Were you holding it together? A. Yes, I was holding it in my hand.

'' 'Q. Holding it in your hands? A. Yes.

'' 'Q. And it was during the time that you were standing about two feet you think away from the door was that when you say he opened the door? A. What is it?

'' 'Q. Was that when you say he opened the door, when you were standing about two feet away from the door? A. Well, I wouldn't say it was exactly two feet; I have never measured it and I don't know just exactly, about two feet, but it was some little distance from the door. It was a little distance, not very far.

'' 'Q. You were standing there, you think, a foot and a half or two feet. A. Something like that; I don't know just exactly the certain measurements.

'' 'Q. That is when he opened the door? A. That is when he throwed the door open and knocked me down.

'' 'Q. You were holding the bathrobe together at that time? A. With one hand.

'' 'Q. Did you have anything in the other hand? A. No, sir.

'' 'Q. You didn't stand up there against the door like this, did you (indicating)? A. Why, no, sir.

" 'Q. Did you have your hands down here with respect, in front of you, holding your bathrobe together (indicating)? A. One hand like that (indicating).

" 'Q. One hand there (indicating)? A. One hand across my bathrobe.

" 'Q. And the door, when it came against you, didn't strike your hand, didn't strike any place about your anatomy except the stomach? A. No, sir; just the lower part of the abdomen, of course. The whole force of the door knocked me back, but the knob of the door is the one that I really surely felt.' "

The foregoing, in substance, correctly sets out the evidence in chief offered in plaintiff's behalf. At the close thereof defendants demurred thereto, but it was overruled and defendants thereupon introduced their evidence.

Defendant, Frank Benton, testified that he was working for the Singer Sewing Machine Company and had been for about seven or eight years; that in 1927 he was acting as manager of the shop for the said company; that after Weaver told him he had sold a machine, he called upon plaintiff and asked her to "verify" the sale; that said call occurred in the morning of June 3, 1927. He asked her if she bought the sewing machine. If she had any verbal agreements with the salesman, if she understood the balance that she owed and how the payments were to be made?

"And she seemed to know all about it. She agreed to sign it; I filled it out and handed it to her. She went over to the bureau, made motions that appeared to be that she was signing it. She handed it back to me and nonsuspecting, I put it back in my pocket."

He further testified that he took the slip to his office and there the bookkeeper called his attention to the fact that the slip was not signed; that he went back to her home in the afternoon, right after dinner, knocked on the door and got no response; that he rapped again, but got no response. He then asked one of several children playing in the street to call the plaintiff, she tried to get in the door but someone shut it, and the plaintiff finally asked, "Can't you wait until I get some clothes on?" The defendant testified that he apologized and went to the edge of the porch and waited there. His testimony is contradictory of that she gave, saying that he talked politely to her and explained what he wanted and denied that anything occurred by which she was struck or could be hurt. He went across to the drugstore and telephoned his office and told the bookkeeper that the lady refused to sign; that afterwards a little girl came over "and I believe she said her mother wanted to see me." He turned around, saw the machine standing on the porch and he went over and picked it up. When he was about ten or fifteen feet away from the porch, plaintiff came out and said: "Give me that

paper I signed," and he handed it to her. He denied that he forced the door or stepped inside, denied that he demanded $5; he further testified that the agent Weaver was discharged by him that morning before he went out to plaintiff's house.

The foregoing evidence, introduced in behalf of *defendants* is shown for the reason that it corroborates plaintiff's testimony in nearly every particular except in the matter of the assault and the outrageous language and conduct she says was used and done by him.

Defendant, Benton, also testified on cross-examination that he was manager at one of the six branches of the Singer Sewing Machine Company in Kansas City; that he had no office but would spend one day at one shop and the next at another but he had no regular place; that he had been employed by the Singer Sewing Machinge Company for seven or eight years excluding about two and one-half years when he was in New York recently; that he left Kansas City in the latter part of 1929 and came back in 1932. He also testified (referring to the verification slip): "I said she had to sign it, it wasn't asking too much for her to sign it and I couldn't accept the sale unless it was signed and I explained to her that the company wouldn't bother her if she did sign it, that it was merely a formality and she would be helping me by signing it so I could go my way, and she said: 'You get off my porch or I will get my gun and kill you.' . . . I told her if she was going to act that way that I would have to have my sewing machine."

He testified that, after again threatening to get her gun if he didn't get off the porch, "she walked back into the house and slammed the door in my face." He knocked again and called through the door that if she didn't sign the verification slip and wouldn't give up the machine, "I would have to call an officer and replevin it;" she did not reply but walked to the back part of the house. He went south across the street "and a little bit east of the house," but didn't call an officer, he called his office. He testified he had no intention of calling an officer. He then corroborated plaintiff as to the little girl coming over and telling him plaintiff wanted to see him and he went over, but he says he found the machine on the porch and he picked it up, but when he was about ten or fifteen feet away, plaintiff came to the door, opened it and said to give her back the paper she signed; that he then gave her both the contract and the verification slip.

Defendant also offered in evidence the evidence of two doctors or internes at the hospital, one covering the time she was there after the alleged assault and about June 19, 1927, and another about a year later, that is, on June 14, 1928. These records seem to have been made by the doctor who had charge of the patient and as explained

by them were what they gathered from her answers to questions asked her. The doctor who was in charge June 19, 1927, testified she did have a miscarriage then. The evidence was to the effect that plaintiff never at any time disclosed that she was injured by a blow such as she complained of in this suit. Some of the records introduced were nurses' records and it appeared from the evidence of a nurse that she did not write some of it and that, at the time the part appearing in her handwriting, reciting matters purporting to have occurred, she was not *present*. In short, the records are not such as to *conclusively* bind plaintiff, and even if they are hospital records they do not, *as a matter of law*, defeat plaintiff's case, or show that her miscarriage was *not* the result of the assault of which she complains.

Defendants also introduced the evidence of persons living or working in the vicinity of plaintiff's home in the attempt to contradict her and prove that nothing of a wrongful, improper or forceful character took place as she claims.

An examination of this evidence shows that the first witness on that subject, Mr. Miller, was working about his residence and perhaps 100 feet away. He testified to seeing Benton just outside the door, with his hat off, talking to plaintiff. "I just noticed him over there for a moment or so;" that Benton left the door and went across to the drug store, where he used the telephone. The plaintiff then moved the sewing machine out on the porch and left it "outside the door on the porch." Witness then testified a little child came over to the drugstore and told Benton to come over and get his machine. Just how he knew what she said does not appear. He did not see Benton pick up the machine. "I didn't pay any attention to what happened afterwards." He testified he never saw Benton open the door or attempt to do so.

On cross-examination, it developed that witness lived diagonally across the street from plaintiff's home; that there was nothing of anything out of the ordinary had occurred so he went right ahead with his work, he did not see Benton go there, nor did he know what transpired as to who opened the door, he did not know anything about it of his own knowledge.

Another witness was introduced in defendants' behalf who lived upstairs in a southwest apartment while plaintiff lived in the southwest apartment on the ground floor. Witness could not fix the date exactly, but it was summertime and the windows were open. He was upstairs with the children. Witness said he couldn't say the exact time but that it was *between ten and eleven o'clock in the morning*, that he didn't *remember of his (Benton's) being there in the afternoon*. He did not hear any crying or screaming. Heard no loud talking. Witness said he "was sitting back a little ways

from the window;'' he did not look down specially to see what was down there. He heard Benton say he came after the machine; that he saw him come across the street and saw him come after the machine and he said, ''I will get it.'' Benton went across the street from the drugstore and came back and got it. Witness said, ''I could see the machine setting there'' (on the porch). When asked on cross-examination if he and plaintiff's husband, Spangler, had had some trouble, he said, ''Yes, sir, we had a little fight'' and they went to jail too for the fight but didn't stay there very long. Heard plaintiff say, ''Here is your machine.'' Witness did not see Benton when he came there the first time; the first thing he heard him say, he had come after the machine and that was about eleven o'clock, he wouldn't be positive.

Other witnesses testified for defendants, but not about the happening of the matters complained of concerning the assault but other matters concerning what plaintiff had told them concerning medicines she had taken and what she had done to produce miscarriage. These were all flatly denied by plaintiff as well as the charge that she had ever had the disease or diseases defendants' witnesses said she had, or that she ever told the doctor at the hospital when she had her first miscarriage, June 19, 1927, that her ''present illness began four weeks ago'' (which, of course, would put her illness arising prior to the time of her alleged trouble with Benton).

As to all the evidence introduced by defendants, that which has been specifically set out was so done to show to what extent plaintiff was corroborated as to Benton coming to her house and what she denied, it is well settled that the question of who was telling the truth was a matter solely for the jury to pass upon, and also to say whether the witnesses had sufficient opportunity to correctly state what happened.

After setting forth the evidence to perhaps an unreasonable and unnecessary extent, it would seem to be manifest that plaintiffs in error's point 3, that there was ''a complete failure of proof'' cannot be upheld.

Points 4 and 5 of plaintiffs in error that ''the court erred in admitting irrelevant, immaterial, improper and incompetent evidence outside the issue, in behalf of plaintiff,'' and that ''the court erred in giving each and every instruction given on behalf of the plaintiff,'' are too general and do not specifically point out the alleged errors to require our ruling thereon. An appellate court need not search record to find rulings complained of; Nevins v. Gilliland, 234 S. W. 818; see also Kiger v. Sanks, 1 S. W. (2d) 218; Martin v. Continental Ins. Co., 256 S. W. 120; Williams v. American Exchange Bank, 280 S. W. 720.

We may say at this point that the *''Supplemental* Assignments of

Error" in plaintiffs in error's reply brief which are in effect *new* assignments and not in reply to anything raised by the brief of defendant in error, should not be considered because not proper in a reply brief since that would, in effect, extend the time beyond the date required for the filing of the original brief. Again, most of these are so-called errors in permitting certain questions to be asked and answered, and some of these were not objected to, or reason therefor given, and in such the trial court should not be convicted of error had the points been *timely* raised in the briefs and presented to the appellate court.

It is next urged that the court erred in refusing defendants' asked Instructions A, B, and C. So far as concerns defendants' refused Instruction A, it is, in our view, fully covered by defendants' given Instruction D. It defined an assault and battery and then told the jury that the burden was on plaintiff to prove by the greater weight of the credible testimony that Frank Benton did on or about June 3, 1927, "force his way into the home of the plaintiff intentionally, wilfully and with violence and as a result thereof did strike or cause plaintiff to be struck in such manner and form that the injury of which plaintiff complains was the direct and proximate result thereof," and that unless they found from the evidence that Benton "did so enter plaintiff's home by force and violence and wilfully and intentionally inflicted on plaintiff bodily injury, which, as the direct and proximate result thereof, caused the injury, if any, of which plaintiff complains, then your verdict must be for" both defendants. Now defendants' Instruction A did not go to any of the actionable issues in the case, did not submit anything concerning the claimed wrongful acts of defendant Benton but attempted to tell the jury that if he called at her residence and requested plaintiff to sign the verification slip, and if plaintiff refused to sign it, then he had the lawful right to demand the return of the sewing machine and the further right to inform plaintiff that if she refused to deliver it to him "that he would *call an officer to replevin it.*" The trouble with this last, which we have here emphasized, is that there is no evidence anywhere that he said to her he would call an officer *to replevin it.* He could have replevined it without *calling an officer* out there. What she says he said was that he would *call an officer*, and this was an intimidating threat which added to her fright and dismay. Refused Instruction A therefore submitted something of which there was no evidence. As drawn, it was misleading, confusing and would have allowed a misconception of the theory on which the case was based to creep into the case. Instructions B and C were merely peremptory instructions to find for each of the respective defendants. That question has already been passed

upon and ruled adversely to the defendants. There was no error in refusing defendants' Instructions A, B, and C.

As to the alleged improper arguments of counsel for plaintiff, which were barely mentioned in connection with another point in the *original* brief for plaintiffs in error but are more specifically elaborated in the *reply* brief; but conceding, *ex gratia,* that they are entitled to be considered, the examination of the record discloses that no objection was made to them except perhaps two, and one of those seems to have been abandoned, and, as to the other, the only request made was that the jury be instructed to disregard the argument complained of. We are of the opinion that the reason the court ignored the request and directed plaintiff's counsel to proceed is that some of the arguments were in answer to arguments made by the opposite side and that the other was not erroneous. As to those to which no exceptions were saved, it is well settled that in such even the point is not available on appeal. [Murphy v. Fidelity National, etc., Co., 49 S. W. (2d) 668, 671.] As to the objection and exception saved to the ruling made on the argument of counsel for plaintiff on the hospital records and the effect given them, the objection seems to rest on opposing counsel's *construction* of the argument. The trial court was in far better position than we to pass on the objection. [Gossett v. Kansas City Public Service Co., 17 S. W. (2d) 372, 375, citing State ex rel. v. Davis, 315 Mo. 186; Gray v. Phillips Building Co., 51 S. W. (2d) 181, 186.]

It is contended by plaintiffs in error that the trial court committed error in allowing plaintiff to state that when Benton was taking the machine away he threw on the porch the papers *but did not return* the $5 she had paid. She also said that Benton, prior to getting the machine, had demanded an *additional* $5. We find no objection to this last in the record. There was an objection and an exception to the evidence that Benton did not return the $5 plaintiff had theretofore paid on the machine. The only basis of the objection was: "There is no question here in respect to the $5 whatever." True, the petition did not contain anything to authorize a recovery of the $5 she had paid. But the fact that when Benton had, as plaintiff contends, arbitrarily terminated the contract for the purchase of the machine, one would naturally assume that he would return the money paid thereon, and the fact that he did not do so, would be admissible as a part of his alleged conduct toward plaintiff on that occasion. There was no reversible error in this.

Nor can it be deemed error to admit the evidence as to a subsequent operation and a second miscarriage. These were claimed by plaintiff to have directly resulted from the injury she sustained from defendant Benton, and she introduced testimony tending to support that claim, and this made it admissible as a question for the jury.

944

No objection was made to this testimony, nor that the petition did not properly cover it, and the trial proceeded apparently on the theory that the petition did cover it. At this late date, complaint cannot now be made. [Took v. Well, 53 S. W. (2d) 389, 392; Aetna Investment Corp. v. Barnes, 52 S. W. (2d) 221, 223.] There was no claim of a variance or of surprise. Indeed it is not seen how there could be when no objection was made. If there had been, the petition could and doubtless would have been amended if it were deemed necessary. [Sawyer v. Wabash Ry. Co., 57 S. W. (2d) 108; Erlich v. Mittleburg, 252 S. W. 671. See, also, Bammert v. Kenefick, 261 S. W. 78; Cameron v. Massachusetts Protective Assn., 275 S. W. 988, 993; Dement v. McNeil, 4 S. W. (2d) 831, 832.]

May we be permitted to mildly state that when an authority is *erroneously* cited, it adds greatly to one's labor to take the time to search and find where the case is actually reported. A careful proof reading of the citations adds greatly to the value and usefulness of the brief. These observations are addressed to counsel on both sides of the case.

Finding no reversible error, we are constrained to affirm the judgment. It is so ordered. All concur.