HARRY MCMONIGAL ET AL., RESPONDENTS, v. NORTH KANSAS CITY DEVELOPMENT CO., APPELLANT.—129 S. W. (2d) 75.

Kansas City Court of Appeals.   March 6, 1939.

*James S. Simrall, Conn Withers* and *Henry L. Jost* for appellant.

*Henri L. Warren* for respondent.

SHAIN, P. J.—This is an action seeking to recover a commission for sale of real estate. Trial was before a jury, resulting in verdict for plaintiff in the sum of $1695.73. Judgment was in accordance with the verdict and defendant duly appealed.

To conform to situation in trial court, we will herein designate respondents as plaintiffs and appellant as defendant.

While the law as to real estate agents' right to a commission has been well defined by the courts of this State, still the review of the case at bar is rendered somewhat difficult by reason of a great volume of evidence on matters but collaterally involved that throw but little light upon the vital issue in the case. Each party to the suit has furnished us with elaborate statements that, as based on respective theories of the parties, are clear and cogent. As to these statements, the respective litigants cannot complain of the fact that counsel has not presented a statement most favorable to their side of the case.

Confronted with such situation we are compelled to formulate a statement by the study of a three hundred and ten page record, being aided, of course, with opposing briefs totaling over two hundred pages.

The plaintiffs having been successful in the lower court, it becomes our duty to search the voluminous record and glean therefrom the facts most favorable to plaintiffs, ignore contradictory evidence produced on behalf of defendant, and formulate an abbreviated statement as a basis for our review. In following the mandate of the law in the above respect, Judges of the courts of appeal are often wrongfully accused of casting aside the Judicial Ermine and assuming the roll of advocate.

The issues in this case grow out of the purchase of improved real estate in North Kansas City, Missouri, to be occupied and used for manufacturing and sale purposes. To an understanding of the issues we here state, that at the beginning of negotiations there were no buildings on the ground suitable for the purposes of the business of

the customer. In consequence of such situation, much parley and negotiation occurred, resulting in a preliminary contract, and finally in a contract of sale of improved real estate on long deferred installment payments.

Involved in the negotiations were five men who were concerned or active in matters involved. These persons were called as witnesses, and we deem it advisable to here name those parties and signify as to the particular relation of each to the matters involved: The purchaser in the case at bar was the Crooks Paper Box Company, and in the negotiations involved, Mr. Edward N. Crook represented the company and was called as a witness by plaintiffs; The plaintiffs herein were a co-partnership and in all of the negotiations Mr. Earl B. Taylor represented the co-partnership, being the principal witness for plaintiffs; Mr. George B. Franklin, who was called as a witness for plaintiffs, is an architect who throughout the negotiations drew and submitted plans for the improvements and estimates of costs that were taken into consideration in reaching an agreement.

The defendant, owner of the real estate, and builder of the improvement, and seller, called two witnesses: Mr. Hugh J. Curran, who was President of the company up to October, 1937; And Mr. A. W. Zimmer, son-in-law of Mr. Curran, an employee of the corporation.

Prior to October, Mr. Zimmer was associated with defendant under the title of "Industrial Agent" and after the retirement of Mr. Curran was made an officer in the corporation. The negotiations with defendant, as to matters herein involved, were principally with Mr. Zimmer.

Throughout the trial a real estate firm by the name of Moseley & Company is frequently mentioned. It is shown that this company was active in the deal and have been paid a commission on same by the defendant. Mr. Ball was the active participant for said company in the deal and much is said concerning what he did and said. However, neither plaintiffs nor defendant saw fit to call Mr. Ball as a witness.

The controversy in this case is concerning the right of plaintiffs to collect a commission. No point is raised as to the amount involved or as to standard rate of commission.

The plaintiffs state a cause of action as follows:

"That on behalf of the plaintiffs' co-partnership, and acting for the same Earl B. Taylor, during the later part of November, 1936, through one, Brooks Bell, and himself in direct conversation disclosed to one A. W. Zimmer, the fact that he, Taylor, had a prospect for a large factory location and disclosed the name of The Crooks Paper Box Company to the said Zimmer as such prospect.

"That at said time, said Zimmer was the authorized agent for real estate sales of the defendant corporation carrying title of "industrial agent" and was acting as such agent and continued to act for defendant corporation as agent in all the matters hereinafter complained of.

"That at the time of said disclosure and in consideration, therefore the defendant through said Zimmer acting for the defendant and within the scope of his authority agreed orally that it would pay to said Taylor a sum equal to one-half of the usual real estate commission paid in and about Kansas City, if a sale was made to the said Crooks Paper Box Company."

The defendant answers by general denial and follows with:

"For further answer to plaintiffs' said ammended petition, as amended by interlineation, defendant denies specifically and under oath hereto attached that it entered into and executed and made or agreed to the contract set up and pleaded by the plaintiffs in their said amended petition, and denies that defendant entered into or made any such agreement of any kind or nature as claimed by the plaintiffs in their amended petition, or otherwise."

Defendant's answer is under oath. Defendant in its brief makes "Assignments of Error" under eighteen heads and under "Points and Authorities" groups same under twelve heads. In its specific charges of error the defendant comments with statement of reasons and by way of argument, comment and reference to evidence. We conclude that it is impractical to set out in full as presented in the brief, but will review as classified under "Points and Authorities."

The defendant's claims of error are principally based upon defendant's theory of the case as plainly set forth in its answer, *supra*. Under points Nos. 1 and 2 contention is made that petition does not state a cause of action against defendant. This contention is principally based upon the contention that Mr. Zimmer had no authority to employ plaintiffs and obligate defendant to pay a commission.

The above contention presents a key to the principal contention of defendant touching claims of error. Such being the case, it will clarify matters for us to review and conclude as to this contention. By doing so we will be conducive to briefness in our review of other points.

The defendant is shown by the evidence to be the holder of a large tract of land in North Kansas City and its business appears to be that of developing its holdings into manufacturing and business enterprises. It is a corporation and as such its business is conducted through its representatives and employees. Its business might well be termed as Industrial Development. Mr. Zimmer, who had his desk in the offices of defendant, was held out to the public as defendant's "Industrial Agent" and after October, 1937, became an officer of the corporation.

The evidence is clear to the effect that during the negotiations herein involved, Mr. Zimmer was the head of a very important department of the defendant's business. The evidence discloses that in this transaction, which involved over one hundred thousand dollars, Mr. Zimmer represented the defendant in practically all of the negotiations. Also

evidence discloses that the tentative agreement between the Crook company and defendant was prepared in the office of plaintiffs, and that Mr. Zimmer appears to be the only representative of defendant present when this agreement was drawn up. The fact that this tentative agreement was subject to the final approval of the board of directors of the defendant corporation, when taken with the facts in evidence, has no probative value as sustaining defendant's claim that, as to Mr. Zimmer's acts in the transaction involved herein, he was not acting within the scope of his authority.

When we study the evidence in this case and give consideration to same in the most favorable light to plaintiffs, we conclude that the evidence clearly presents an issue of fact as to Mr. Zimmer's authority to act for and bind defendant in all wherein he is shown by the evidence to have acted and done in the matter involved herein. As to his authority, the jury has spoken and the plaintiffs' pleading, considered in the light of above, we conclude states a cause of action against defendant.

Defendant's point No. 3 is predicated upon the claim that Mr. Taylor and Mr. Ball, of Moseley & Company, acted together and jointly in disclosing the Crook company as prospective purchasers, and jointly participated in the conversations with Mr. Zimmer, and jointly claimed an interest in the full fee to be divided between them. Based upon this theory, defendant claims plaintiffs cannot maintain this action for one-half of the commission jointly owned.

The defendant cites much authority that supports its claimed conclusion if the premises from which the conclusion is drawn be born out by the evidence that is most favorable to plaintiffs.

Mr. Earl B. Taylor testified that his business was that of "contracting, managing of property, real estate." He testifies that insofar as matters herein involved, same was taken up with the Crook company in September, 1936. At that time, he says he was called by the Crook people and consulted about cost of remodeling a building for expansion of the Crook Paper Box Company.

Mr. Crook, when on the stand for plaintiffs, detailed an interview he had with Mr. Taylor in reference to finding a new location for the Crook plant. In Mr. Crook's testimony, the following questions and answers appear:

"Q. Did you commission, instruct or authorize Mr. Taylor to do that on your behalf? A. No, sir.

"MR. JOST: How is that?

"THE WITNESS: We did not.

"Q. (By MR. WARREN): What instructions did you give Mr. Taylor? A. Mr. Taylor volunteered that he would—that he'd try to find something. We told him what we wanted, and he volunteered that he would try and locate something suitable for us.

"Q. Did you— A. (Interrupting) An available plot of ground.

"Q. And what, if anything, did you do in reference to him volunteering to do that? A. Later on, why, we looked at some property.

"Q. No, I mean at the time when Mr. Taylor said he would try to get a location for you? A. Well, that was agreeable to us.

"Q. You agreed to that? A. Yes, we agreed to that."

Mr. Crook testified that all of his dealings were with Mr. Zimmer up to the time he signed the contract. Mr. Taylor testified that after his arrangement with the Crook company he contacted Mr. Ball of Moseley & Company.

The following questions and answers appear:

"Did you make any arrangement with Mr. Ball with reference to the commission on this Crook deal? A. I explained to Mr. Ball, before I mentioned to him the name of the Crook Paper Box Company, that I had these prospective buyers, and I expected to be protected in the commission, and that I wanted him to work with me on trying to locate them.

"Q. What did Mr. Ball say in regard to that? A. That was agreeable with Mr. Ball.

"Q. Is that what he said? A. He said, 'I will see that you are protected in it,' yes, sir.

"Q. Why did you contact Mr. Ball? A. Well, two reasons. Probably he has a wide knowledge of large tracts of land, and they are licensed brokers, and I had known Mr. Ball for some little time, and it wasn't like dealing with a total stranger."

Under arrangements made by Mr. Ball with Mr. Zimmer, to meet Mr. Zimmer in regard to the location for the Crook company, Mr. Taylor and Mr. Ball met Mr. Zimmer in North Kansas City in October, 1936. As to this meeting, Mr. Taylor testifies as follows:

"Q. (By Mr. Warren): Now, Mr. Taylor, go ahead and tell what was said and done at that first meeting with Mr. Zimmer. A. Well, Mr. Ball introduced me to Mr. Zimmer, stating that I had some clients that were interested in locating a building, and we came over to look at North Kansas City property, and he explained to Mr. Zimmer that —or I explained to Mr. Zimmer.

"The Court: (Interrupting) No, just state what you said to him now, not the substance of it, but just what were your words. A. 'That if this deal materializes and we get the Crook Paper Box Company to come to North Kansas City I expect to have the real estate commission.'

"Q. Is that as near as you recall the words in that conversation? A. Well, as near as I can recall, that is.

"Q. Now, did Mr. Zimmer reply to that? A. Mr. Zimmer told me he didn't care who they paid the commission to, that they have paid as high as two commissions to get people to come to North Kansas City."

Further questions and answers appearing in Mr. Taylor's testimony:

"Q. (By MR. WARREN): Will you repeat that, Mr. Taylor, and try to make it as clear as you can to Mr. Jost, about what Mr. Ball said about it. A. Well, when Mr. Ball introduced me to Mr. Zimmer and told Mr. Zimmer about the Crooks people, and that they were my clients, he mentioned that I expected half of the real estate commission, and that was about the extent of Mr. Ball's conversation. The rest was with Mr. Zimmer and I, until we got to looking around at the different properties that we inspected over in North Kansas City."

It is shown that Mr. Crook, thereafter, accompanied by Mr. Ball and Mr. Taylor met and conferred with Mr. Zimmer in North Kansas City. At that time Mr. Zimmer gave prices of the real estate by square foot and showed the property lines. From and after the aforesaid meeting, there were frequent meetings with Mr. Zimmer at which negotiations were had. As the Crook company desired to have the factory built, Mr. Franklin, an architect, was called in and made drawings and estimates as to costs.

Mr. Taylor testified that he conferred, touching the deal, with Mr. Zimmer at his desk in defendant's office. The following questions and answers appear:

"Q. Mr. Curran is the president of the North Kansas City, or was the president of the North Kansas City Development Company at that time. Did you see him there while you were in the office? A. Oh, I have seen him there, and he had passed by, and we were working, and wanted to know how we was getting along. He said that we were kind of dragging, that we fellows had better hurry up on it.

"Q. Did he take any part in these discussions, as to what the requirements of the North Kansas City Development Company were? A. No, he did not."

As to negotiations with Mr. Zimmer, Mr. Taylor testified: "A. Well, there was about as much at my office and down at Mr. Zimmer's office, a half a dozen times or so, approximately, and it was usually— the general discussion was at all times—it was on the cost of the building, and hurrying up the deal to locate Crook in North Kansas City. Now, that was the topic of the conversations."

Mr. Taylor testified that the first agreement was prepared and typed in his office and that he requested and was given a copy by Mr. Zimmer.

Concerning the above, Mr. Taylor's testimony is as follows:

"Why, when Mr. Zimmer and Mr. Ball and I took these agreements down to Mr. Crook's office for signing, and as we walked downstairs I asked Mr. Zimmer if it was all understood about the commission that I was to get now, and that he was to have Mr. Curran sign these agreements, and in turn give me one of them, and he told me that everything was all right about the commission, and that he would see that I got a copy of that agreement, which is that copy there."

It appears that Mr. Franklin prepared the plans and specifications involved in the negotiations. The following is shown by the record:

"Mr. Warren: (Reading) 'Agreement. This agreement made and entered into this 30th day of January, 1937, by and between the North Kansas City Development Company, a corporation duly created, organized and existing under the State of Missouri, hereinafter called the Development Company, party of the first part, and Crook Paper Box Company, a corporation, duly organized . . .' and so forth; 'hereinafter called the purchaser, party of the second part. The Development Company is the owner of tracts of land lying in and situated in the County of Clay, State of Missouri, hereinafter . . .' Then begins a description of this land, which I won't read to you, a legal description about feet, lot numbers and things of that kind, then a provision as to what the deed of trust contains, provision for payment of taxes and so forth.

"Q. Mr. Taylor, subsequent to this meeting with Mr. Franklin with reference to his fees, what next did you have to do with this transaction? A. Well, I waited for Mr. Franklin to prepare the final drawings and specifications after this meeting in Mr. Zimmer's office that you have referred to.

"Q. Yes, sir. And then what did you do? A. Proceeded to figure the job from those plans and specifications, submitting same to Mr. Crook and Mr. Zimmer to make sure there were no more changes."

It is shown that Mr. Taylor prepared and filed a sealed bid on the construction which was withdrawn before considered.

Mr. Taylor testified on cross examination as follows:

"The reason I went to Ball, of Moseley & Company, they are better equipped and more familiar with industrial tracts around Kansas City than nearly anybody that I know. They have resources of contact with the officials, the powers to be, that have the sanction of, or the authority, rather, to go ahead with the deal, and I went to him for that reason, because I did not know anyone connected with the Fairfax District. I did happen to know Mr. Altschuler of the Katy Railroad, but I didn't—he was the only one, of all the places that we inspected, that I really knew, but Mr. Ball has had previous experience and dealings with these other people."

On January 8, 1937, Mr. Taylor notified Moseley & Company, by letter, as to plaintiffs' claim for a commission. Mr. Taylor testified that no part of the commission had ever been turned over to plaintiffs by Moseley & Company.

On January, 1937, Mr. Taylor wrote a letter to the defendant and delivered same to Mr. Zimmer. In this letter he notified defendant of the claim for commission.

The tentative agreement bears the date of January 5, 1937, and the final contract was made January 30, 1937. Mr. Zimmer was in position to know of plaintiffs' activity. Mr. Curran, the president of the corporation, had seen Mr. Taylor in the said corporation's office and must have known from the nature of his inquiry and remarks that

Mr. Taylor was on the job. After notice of January 6, Taylor is shown active in the negotiations.

Mr. Curran, as a witness for defendant, gives conflicting testimony to that of Mr. Taylor. However, Mr. Curran was never active in the negotiations and testified from the standpoint of information received from Mr. Zimmer. Mr. Zimmer contradicts Mr. Taylor in many points. Mr. Zimmer's testimony is shown to be from the standpoint that he had no authority to bind the corporation.

The defense made by defendant is consistent with Mr. Zimmer's testimony, and the question of ratification is urged by defendant as based upon the theory of want of power in Mr. Zimmer to bind the corporation. It is urged that ratification is not pleaded.

It is usual in corporation dealings that contracts made by its agents must be passed upon and approved by its board of directors before the corporation becomes bound. However, such approval, when plainly expressed as necessary in a tentative contract, we conclude, does not come under the classifications and law as involved in ratification. Especially is this so under the facts in this case herein. Mr. Zimmer is shown as acting for defendant in carrying out the very purpose for which the corporation was organized and in the direct line of duty that his title indicates. We conclude that when the contract was approved by the board of directors, that the corporation becomes liable for all obligations necessary to a culmination of the result of Mr. Zimmer's efforts. A corporation of necessity acts by and through its agents. A corporation cannot delegate its agent to carry out the very purpose of its corporate existence and then escape responsibility for its agent acting in line of duty, and where it reaps the fruits of his efforts.

The defendant is shown as interposing objections on what appears to be a theory to the effect that, in the various negotiations between Mr. Taylor and Mr. Zimmer, a new and separate contract became involved.

If and when the owners of real estate accept a buyer introduced by an agent, thereafter all acts and all negotiations between the accepted prospect and landowner constitute an endless chain up to culmination, and but one contract is involved. In connection with the facts set forth and conclusions reached by us, it is well to give consideration to well founded principles of law.

One does not have to be a licensed broker to be entitled to a commission. [Dysart v. Murphy, 215 S. W. 752.]

There is evidence clearly to the effect that Mr. Zimmer was directly told that the Crook company was plaintiffs' prospective purchaser. It is the well-established law in this State that where an agent finds a party who desires to buy land and tells said party of the location (so that he may go and see the land) and afterwards tells the owner of the land the prospective purchaser's name (so that the owner sees

the purchaser and effects a sale) then the agent is entitled to commission. [Henderson & Jones v. Mace, 64 Mo. App. 393; Burks v. Woods, 10 S. W. (2d) 350; Morgan v. Keller, 194 Mo. 663, 92 S. W. 75; Smith v. Stubb, 293 S. W. 496.]

It is the well-settled law of this State, that to be entitled to a commission the agent must be the procuring cause of the sale. Much judicial discussion has arisen concerning "procuring cause." In the light of the law cited above, and in the light of the fact that the Crook company was introduced as plaintiffs' prospect, and in the light of the testimony concerning the activity of Mr. Taylor, we conclude an issue of fact was made as to "procuring cause" and the jury has spoken.

The defendant stresses the point that the plaintiffs, if entitled to a commission, then same is jointly with the Moseley company, and that plaintiffs cannot recover in this action.

A general principle of law is that a debt to a partnership is fully satisfied by a payment to any member of the partnership. However, no partnership is claimed or shown with plaintiffs and Moseley & Company. Two independent parties were participating as agents in this transaction. According to testimony most favorable to plaintiffs, there was a direct understanding that plaintiffs were to receive a one-half commission.

The case must be determined by the facts as disclosed by the evidence most favorable to plaintiffs. Mr. Zimmer, at the outset, was plainly told that the Crook company were plaintiffs' clients, and that plaintiffs expected one-half the commission. When the tentative contract, prepared in plaintiffs' office, was taken to Mr. Crook to sign, Mr. Taylor again called attention of Mr. Zimmer to the matter of a commission, and Mr. Zimmer told Mr. Taylor that everything was all right and that he would see that Mr. Taylor got a copy of the contract. Plaintiffs' letter, the day after the signing of the tentative contract, plainly gave notice of his claim of commission. With such notice and under the facts shown, we conclude that whatever disposition defendant has made, with matter of commission to Moseley & Company, the plaintiffs' rights herein are not effected thereby.

Defendant's point No. 4 is, that the evidence does not establish a promise to pay plaintiffs and that there is no evidence showing an oral agreement to do so.

Defendant's point No. 5 is based upon a claim that agreement, if any, was a joint agreement with plaintiffs and Moseley & Company.

Points Nos. 3, 4 and 5 have so much in common that in reaching our conclusion on point No. 3, *supra*, we have of necessity given consideration of points Nos. 4 and 5, and based upon what we have said and concluded in the matter of point No. 3, we conclude that points Nos. 4 and 5 present nothing wherein we can conclude error.

Defendant's point No. 6 is complaint of the testimony of witnesses

Taylor, Crook and Franklin, as to declarations of Mr. Zimmer. The point is based on defendant's claim of Mr. Zimmer's lack of authority. Based upon conclusions as to points Nos. 1 and 2, *supra,* we find no error.

Defendant's point No. 7 is based upon failure of plaintiffs to plead ratification. Based upon our conclusions stated in discussion of point No. 3, *supra,* we find no error.

Defendant in its point No. 8 claims error in the admission of testimony brought out in cross-examination of Mr. Curran, touching the fact that the C. B. & Q. Railroad had an interest in the development of North Kansas City.

In the direct examination of Mr. Curran, the defendant brought out the fact of "affiliated companies." In testifying to the *status* of Mr. Zimmer, the following questions and answers appear:

"Q. He had no connection with any of the other affiliated companies, did he? His work was altogether sales agent for the North Kansas City Development Company? A. You are talking about the affiliated companies?

"Q. Yes. A. Affiliated with our company?

"Q. Yes. He had no connection with the North Kansas City Bridge and Railroad Company, for instance? A. No. His duties were entirely confined to—

"Q. (Interrupting) The North Kansas City Development Company? A. North Kansas City Development Company."

During the trial of the case, question arose concerning Mr. Zimmer's name on the letter heads of the defendant corporation, and in the cross-examination of Mr. Curran the following questions and answers are shown to have been admitted without objection or exception:

"Q. Why did you have at the time of the stationery, above the Development Company that owned the real estate, North Kansas City Bridge and Railroad Company? A. That is the form of our stationery in all of the departments including my own. We put the two companies on there.

"Q. How many companies have you got there? A. Altogether we have eight companies.

"Q. What are they? A. Well, there is the North Kansas City Bridge and Railroad Company and the North Kansas City Development Company. Those are the two parent or principal companies. Then we have other real estate holding companies, the North Kansas City Land Improvement Association, the Parkside Land Company. the Guinotte Land Company. Then we have the old Kansas City Ferry Company. That is not operative, but the corporation is still alive. We have the North Kansas City Lighting and Power Company, the North Kansas City Water Company, and the Terminal Improvement Association.

"MR. JOST: And the Park—

"THE WITNESS (Interrupting): The Parkside Land Company, yes.

"Q. (By MR. WARREN): Now, you were president of all the companies, were you? A. Yes, sir."

The record discloses that during the progress of the trial extraneous matters with but little, if any, probative value to the issue involved appear. The question of "affiliated companies" and the question of who were stock holders appear somewhat foreign to the issues.

It is fundamental, that a litigant should not have the burden of removing from the minds of a jury an admitted prejudice against him. [Theobald v. St. Louis Transit Co., 191 Mo. 395.]

In the case at bar, it appears that both sides have so participated in this matter complained of that neither are in a position to complain.

During the trial of this cause it is shown that the defendant offered documentary evidence as follows: Exhibit 14, a letter of December 9, 1936, directed to Mr. Curran and signed A. W. Z; Exhibit 15, a letter of December 9, 1936, directed to Mr. Curran and signed A. W. Z; Exhibit 16, a letter of December 11, 1936, directed to Mr. A. W. Zimmer and signed H. J. C.; Exhibit 17, a letter of December 19, 1936, directed to Mr. H. J. Curran and signed A. W. Z; Exhibit 18, designated as a duplicate of Exhibit 17. Concerning the introduction of the above exhibits, the following is shown:

"THE COURT: Do you want to object to all these exhibits?

"MR. WARREN: Yes, sir, I object to all of them. They would be private memorandums of the parties, and not evidence in the case. The instructions from Mr. Curran are not signed by Mr. Curran but signed on the typewriter.

"THE COURT: Well, the objection is sustained.

"To which action, order and ruling of the Court the defendant then and there at the time duly excepted and still excepts."

Counsel for defendant, upon refusal of the court to admit above exhibits in evidence, made an offer of proof. The effect of the offer was that said exhibits were records made at the time and during the progress of this transaction, as testified to by Mr. Curran. The offer was made upon the theory that the exhibits "have direct bearing and relationship to the issue in question as to where the authority was in respect to the making of this transaction, and in respect to any commissions, and in respect to the authority of this witness, all of which will appear if these writings were received in evidence, and I except the ruling of the Court." The offer was made while Mr. Zimmer was testifying in behalf of defendant.

Exhibit 14 is concerning proposition of the Union Pacific Railroad, made through Moseley & Company, concerning location in Fairfax District. The other exhibits appear to refer to the North Kansas City deal and appear to be communications between Mr. Zimmer and Mr. Curran, touching matters being discussed between them in working out details of the transaction.

Mr. Curran was permitted to testify at length touching the negotiations as viewed by him through communications with Mr. Zimmer. Mr. Zimmer identified the exhibits as memorandums of transactions between himself and Mr. Curran, and without further identification these exhibits were offered in evidence. We conclude that plaintiffs' objections, *supra*, are well taken. We have examined these exhibits closely and find nothing therein that would justify their admission in evidence under any theory expressed by offer of counsel.

Defendant, under its point No. 10, urges error in plaintiffs' instruction No. 1, as modified by the court. Instruction No. 1, complained of, is a general instruction covering the whole case and permitting recovery as to a one-half commission, and recovery of six per cent interest on amount, if any, due May 14, 1937.

The instruction predicated recovery upon finding that Mr. Zimmer was informed that the Crook company was a prospective purchaser; that Mr. Zimmer was an agent of defendant authorized to make contract for commission; that Mr. Taylor informed Mr. Zimmer that plaintiffs expected one-half of the commission which Mr. Zimmer had agreed thereto; that the sale was a direct result of plaintiffs bringing about contact with defendant and contract resulting therefrom; that plaintiffs were the procuring cause. In the light of our conclusions, expressed *supra*, we find no error in the instructions. We conclude that the evidence touching defendant's conduct, in respect to the acts of Mr. Zimmer, at least presents an issue of fact as power to act, regardless of limitations placed on his authority, if same were unknown to plaintiffs. There is no evidence that plaintiffs were ever informed as to any want of authority of Mr. Zimmer.

Defendant's point No. 12, and last point, is that the verdict is not responsive to the pleading, in that suit was based on contract performed and verdict recites as "assess their damages." Further complaint is that it cannot be ascertained from verdict "how much of said allowed damages is interest."

The above presents an assignment of error of law and not of fact. It follows that we must review same without giving consideration of credibility of witnesses and weight of evidence. [Phillips v. Anderson, 93 S. W. (2d) 171.]

In consideration of this assignment it must be understood that the verdict is the only basis for judgment. [Spangler-Bowers v. Benton et al., 229 Mo. App. 919, 833 S. W. (2d) 170.] In said case a new trial was granted because the verdict did not dispose of all the issues.

Defendant's point No. 2, made as to the verdict, is based upon the law to the effect that interest is not allowable upon damages in actions *ex delicto*. [Lober v. Kansas City, 339 Mo. 1087, 100 S. W. (2d) 267.]

That a verdict must be responsive to the issues and afford protection against the same claim in another action, needs no citation of authority. However, verdicts are not strictly required to be in any partic-

ular form if with certainty the verdict responds to all of the issues, and the meaning of the jury can be made clear from the whole record, and the judgment is shown to be based on what the jury actually found. [Goff v. Hines, 207 Mo. App. 420, 299 S. W. 221.]

The action herein is on an express contract based upon an undisputed sales price and upon percentage of commission that stands undisputed. In order for a verdict to stand under the above state of facts, the verdict should correspond to the precise issue. A greater or a lesser amount becomes germane to the determination as to whether or not the verdict responds to the issue. [Weisels-Gerhart Real Estate Co. v. Pemberton Inv. Co., 150 Mo. App. 626, 131 S. W. 353.]

Insofar as the jury was concerned, its duty was to determine the amount due, if any, under the issues of the case and under the law as declared in the instructions. The jury was not concerned as to whether this amount was termed damages or otherwise. We conclude that the term "damages" may be concluded as surplusage if the verdict is responsive to the issue and, if so, same is not fatal to the judgment based upon the verdict even with the word "damages" appearing therein. [Kimberlin v. Roberts, 107 S. W. (2d) 24.]

Where a verdict includes interest, a separate finding of interest is not necessary. [Mueller v. National Hay & Milling Co., 243 S. W. 420.]

In conformity with the law, as cited above, in consideration of point No. 12, we have made a careful calculation based upon a consideration of the issue being tried, the amount involved, the rate of commission, and six per cent interest from May 14, 1937, to date of verdict, and our calculation shows that the amount of verdict ($1695.73) corresponds to amount of principal and interest for which plaintiffs are entitled, where verdict be for plaintiffs.

We conclude that the verdict in this case meets the requirements of law.

Judgment affirmed. All concur.