**Henry SWITZER and Mattie McAllister, Respondents,**

**v.**

**George Hadley SWITZER, Executor of the Estate of George L. Switzer, deceased, George Hadley Switzer, Individually, Mae Switzer, Dorothy Davis, Lois Cunningham, and Anna Montgomery, Appellants.**

No. 49762.

Supreme Court of Missouri,

Division No. 2.

Jan. 13, 1964.

Edward W. Speiser, Salisbury, Don Chapman, Sr., Chapman & Chapman, Chillicothe, for appellants.

Don Hutson, Robert Van Horn, Hutson & Van Horn, Kansas City, for respondents.

WALTER H. BOHLING, Special Commissioner.

This is an action contesting the will, executed July 31, 1959, of George L. Switzer, who died August 9, 1960, at the age of nearly eighty-six. The petition charged testamentary incapacity and undue influence exercised by Mr. and Mrs. George Hadley Switzer. The jury found against the will on the ground of undue influence. In due course proponents appealed. They question the submissibility of contestants' case, the admissibility of certain evidence, the giving of certain instructions, and the sufficiency of the verdict returned by the jury. Title to real estate passed under the will. Appellate jurisdiction is in this court. State ex rel. Pemberton v. Shain, 344 Mo. 15, 124 S.W.2d 1087 [6].

Contestants had the burden of producing substantial evidence of the alleged testamentary incapacity or undue influence upon proponents establishing the due execution of the will and testamentary competency. Hardy v. Barbour, Mo., 304 S.W.2d 21 [1].

Testator and Flora, his wife, resided on a farm near Mendon, Chariton County, Missouri. They had four children: Henry Switzer, Mattie McAllister, George Hadley

Switzer, known as Hadley in the record, and Anna Montgomery. Henry and Mattie are the contestants, respondents here. The proponents, appellants here, are Hadley, Hadley's wife, Mae, Anna, and two grandchildren, Dorothy Davis and Lois Cunningham, children of Anna, who were reared by testator and his wife. Contestants and proponents are beneficiaries under testator's will.

George L. and Flora Switzer had title to approximately 658 acres of land. Testator's estate was appraised as follows: Real Property: $47,400.00, subject to deeds of trust securing $15,800.00 principal amount; and Personal Property: $344.92.

There is testimony that testator's will, here questioned, substantially increased the share of his estate passing to Hadley and to Mae, Hadley's wife, and reduced the share passing to Henry, Mattie and Anna under a prior will which gave his estate in equal shares to his four children.

Henry testified his mother and father told him that they wanted to get everything divided equally between the children while they were living and asked if he could be present. He said he could but the matter ended there. Other testimony was that testator and his wife decided to keep their property until the survivor passed away.

Flora died January 27, 1957. Her funeral was on the following Wednesday.

Testator, following Flora's funeral, went to Henry's home at Henry's invitation. He remained there Wednesday and Thursday nights. He accompanied Henry to the bank at Salisbury Thursday morning. Henry testified testator talked to Mr. Ingram, the banker, informed him of Flora's death, stated he wanted to make a distribution of his property and asked the banker's advice; that the banker suggested he get his children together, divide his property as equally as he could, and: "Make a joint deed. It will be your property from then on to do as you please with," and at testator's death there would be no room for arguments;

that, on the way home, testator stated he thought Mr. Ingram's suggestion was good; that Friday morning testator discussed the subject with him, and, after stating it might be difficult to divide the property equally, said he thought witness' idea to divide it as nearly equal as possible and give Hadley his choice was good.

Mattie, Mae and Pearl Switzer, Henry's wife, met at testator's home that Friday to clean the house. Pearl brought testator with her. He asked Mae to take him to her home. Hadley and Mae lived on another of testator's farms, and testator thereafter made his home with them. The testimony is that he was well treated and liked it there. Testator visited overnight at Henry's in May, 1957. He never visited at Henry's thereafter. In 1957 he visited Mattie and Anna on one or two occasions.

In the Spring of 1957 testator made a will leaving his estate to his four children, share and share alike. Mae drove him to his attorney's office and to get the witnesses to his will.

Proponents adduced testimony from Mae, Hadley and others that testator told them that on Thursday following Flora's funeral Henry said Mattie and he wanted him to "divide up" his property before farming time. Mae and Hadley testified testator told them Mr. Ingram advised him not to be in a hurry and against dividing his property. Henry had a one-room house on his place where his mther-in-law had lived for some time. Testator said Henry offered to let him stay in that house, but he told Henry he had a home of his own if he wanted to live by himself.

Hadley was working at testator's home place in August, 1957, when Mattie, Henry and Delphus, Mattie's husband, drove up. Henry said to him: "Brother, we are not going to take this off of you. We are not going to take it." Hadley did not know what Henry meant; but later they wanted him to go with them and get testator to divide his property between his children, stating it would be to Hadley's advantage

as he would get the crops he raised. He told them testator had managed his business affairs and he was not going to interfere. Henry accused him and his girls of getting everything testator had. Henry testified they went over to find out what was the trouble; that he asked Hadley and Hadley "kind of, I don't know, maybe flew off the handle a little, and said you know what it was, said it is the things you done"; and, after he talked a while, he told Hadley he, Henry, now knew and didn't have to inquire further. Henry and Mattie then started home, but, noticing Hadley's wife and daughter, Linda, coming, turned and went to Hadley's home. Mae and Linda talked to Hadley and returned home. When they arrived, Henry and Mattie were in the house and Delphus was in the car. Henry said: "Come on in, Mae * *, we know grandpa has made a will." Mae knew this. Henry told his father at that time that they were his children the same as Hadley, and had a right to know about testator's business affairs. Mattie wanted to know what testator was paying Mae for staying there. Testator told them he had and could manage his own affairs. Henry said, "we are not doing any good; we are just making things worse." They then left.

There was testimony that testator said he was tired of Henry and Mattie fussing with him about not dividing his property, and he refused to visit them and asked Hadley and Mae to not allow them to see him unless they apologized for the trouble they were causing. Sometime during 1958 Henry and Mattie were informed by testator or by Hadley of testator's position.

At the suggestion of Reverend Leslie Bates, Mattie and he visited testator at Hadley's in October, 1958. Rev. Bates was minister to testator, Mattie and Hadley. He testified testator "seemed not to recognize" Mattie as his daughter and, also, "I believe he knew she was Mattie." Hadley returned home soon after they arrived, entered the room and in a loud and angry voice ordered Mattie out of the house, stating testator wanted her to apologize before visiting him. Rev. Bates testified Mattie offered to apologize. Mattie left. Testator told Bates he did not discuss his affairs with strangers and Bates left. This was Mattie's last visit to testator at Hadley's.

Henry and Mattie each testified they had made no request after the death of their mother to testator to divide his property between his children.

Hadley had an automobile. After testator came to live at Hadley's he had Mae drive him around. They used testator's car and did not keep their car in repair.

Henry and his son Herbert raised corn in 1957 on one of testator's farms. It was a bad year for harvesting corn. Testator, thinking they were trying to hold the ground, caused a notice to be served on them on June 11, 1958, to get the corn off the land within ten days and deliver his share to the Salisbury Mill Company. Upon receiving the notice Henry and Herbert went to Hadley's to talk to testator. Mae, seeing their approach, told testator, who said he did not want to see them. She went to the door and gave them his message. She did not invite them in. Henry and Herbert harvested the corn but, we understand, too late to crop the land for 1958.

In July, 1959, Mae drove testator to his attorney, R. W. Benecke, of Brunswick, and helped testator up the steps to Benecke's office. Only testator entered Benecke's office. Benecke testified testator told him that, beginning shortly after the death of his wife, Henry and Mattie worried him by demanding he deed his property right now; that he told them their nagging disturbed and upset him and he didn't want them around; that Hadley and Mae had been attentive to him and he felt he had not compensated them enough; and that he was making provision for his granddaughters because his wife and he had practically reared them. There was additional evidence to like effect. Benecke made notes of how testator desired to dispose of his property. Testator took the notes with him

and was to return with the descriptions of his several farms.

One to three days later, Hadley, Mae, testator and Linda drove to Brunswick. Hadley got out at the sales barn and attended a community sale. Mae took testator to arrange for witnesses to his will and then drove him to Mr. Benecke's office. Testator executed his new will, dated July 31, 1959. He destroyed his prior will. Mae waited at the home of one of the witnesses until the witness and testator returned. They then went by for Hadley. Testator, on the way home, told them he had made a new will and named Hadley executor, as in his first will. Hadley and Mae testified they never discussed with testator how he should make his will and he never mentioned any of its other provisions to them.

Testator did not actively farm his land from about 1950. He orally leased different portions to Henry and Herbert and to Hadley on a 50-50 basis. Prior to March, 1958, testator executed a written lease of all his farm land to Hadley for 1958, 1959 and 1960. Under testator's leases he furnished the land, seed and fertilizer, the tenant furnished the labor and the income was divided on a 50-50 basis. There was testimony that an application was made in the Spring of 1958 to place the land Henry and Herbert had farmed in the Soil Bank Program; but, being informed the 1957 tenants would receive a portion of the Government payment, the application was withdrawn, Hadley telling testator he thought Henry had nothing coming because he, Hadley, was farming the land.

Hadley in 1959 and 1960 sublet portions of testator's lands to P. B. Wald. Wald was to furnish the labor and receive half of the income. Testator paid for the seed and fertilizer. Hadley, who furnished neither land nor labor, received one-half of the landlord's share of the income.

Testator would ask and Mae would purchase most of his personal things. Mae and Hadley wrote items in testator's account and financial books and helped prepare his

income tax returns under his supervision and direction. Hadley ordered most of the seed and fertilizer for testator.

Testator received monthly Social Security checks of $84.50, and in July, 1959, told Mae he wanted her to have and use them as she saw fit. Testator personally endorsed the checks until February, 1960, after which he endorsed by mark, Mae, on one or two occasions, guiding his hand.

About October, 1959, testator sold his remaining livestock, realizing between $1,-500.00 and $1,600.00. Hadley sold some steers, sheep and hogs about the same time, and also ten old cows given him for taking care of testator's cattle. He received around $2,400.00 or more for the stock. Soon thereafter he purchased a new automobile for about $2,300.00. There is no showing that any of testator's money went into this purchase. Testator borrowed from the Salisbury bank to pay taxes in December, 1959.

There was testimony that prior to Flora's death, January, 1957, the family got together on Christmas, Thanksgiving and at other times. Contestants testified that Mattie, Anna and Henry were not invited to dinner at testator's home for Christmas, 1957. Proponents testified there was no Christmas "get together" in 1957; that Henry asked them to dinner on Sunday after Christmas and testator said he would not go because there would be fussing and they would not have a good time.

Mattie, Anna and Henry visited testator on Mother's day, 1958, and stated he was happy to see them.

Evidence favorable to contestants on testator's physical condition is to the following effect. Testator had a stroke in 1953. This affected one of his eyes and he was wearing a patch over it by 1957. He continued to manage his property. He was quite deaf. He had two operations for prostate gland trouble prior to 1957. He had a bladder infection, arthritis, and his vision was not good. In May, 1957, he complained of spots

in front of his eyes. By the latter part of 1957 his physical condition had changed quite a bit; and he expressed fear of having another stroke. In September, 1958, he was in the hospital a few days. In December, 1958, he did not discuss current events and stated he could hardly read. He was nearly eighty-five when he executed the will involved.

Proponents' evidence established that testator was in good condition for his age, physically and mentally, was strong willed, transacted his business and possessed testamentary competency.

Hadley took testator to the Marceline hospital January 14, 1960, where testator remained until his death, August 9, 1960. Hadley knew testator was seriously ill; but Mattie and Henry were not notified. Henry had not visited testator after May, 1958. Mattie had not visited him after October, 1958. Proponents presented testimony that before going to the hospital testator said he didn't want Mattie or Henry visiting and bothering him; that it had been almost a year and a half and they had not told him they were sorry; that, prior to Mattie and Henry appearing at the hospital, testator twice pleaded and had Mae promise not to let them in because they had never come to apologize and visit him. Lucile Hedrick, a nurse, heard testator say he did not want Mattie or Henry in his room at the hospital, and that he wanted Mae to wait on him. Mae, except for three days, while ill, waited on testator daily at the hospital from 11:00 a. m., until after the evening meal.

Sometime in February Mattie and Henry went to visit at testator's room. Hadley met them at the door, said: "You are not coming in," and slammed the door in their face. Mattie and Henry complained to the hospital authorities and were told to come either early or late when Hadley and Mae would not be there. Mattie testified that on their second trip (a week or two later) they saw testator; that he recognized them but did not recognize George, her son, or Herbert, Henry's son, both of whom he knew;

that on another visit testator held her hand and wanted her to stay. On another occasion, she entered his room, said "Hello, Dad," and Mae pushed her out of the room, telling her she was not coming in as long as she, Mae, was there. Henry testified that on another occasion testator was glad to see him, held his hand and cried. We understand on another occasion Hadley refused Henry entrance to testator's room and Mae said to Hadley, "Shut the door quick."

The last few days before testator's death Hadley and Mae permitted Henry and Mattie to be in his room. Testator was then in a very poor condition, was not mentally alert, could not carry on a conversation, did not recognize persons, and would lapse into a coma.

The jury could find that Mae and Hadley told the nurses not to let Mattie and Henry visit testator.

Reverend Bates visited testator in the hospital that Spring and stated testator's conversation was not coherent.

Hadley testified that testator trusted him absolutely in their business dealings, and also that he told testator a few times he could not understand why Henry and Mattie acted toward or treated him, testator, the way they did.

The consideration of points involving one of the instructions and the verdict out of the usual order may make the discussion of some matters unnecessary.

Five of proponents' fourteen points attack contestants' Instruction P–16 and the verdict returned thereunder. This instruction submitted different forms of a verdict. It authorized the jury:

(1) If the jury found for the will to return a verdict finding "that the paper writing produced in evidence is the last will and testament of George L. Switzer, deceased." Or:

(2) If the jury found against the will on the ground of undue influence, to return a verdict finding "that undue influence was

exerted on George L. Switzer, deceased, and that the paper writing produced in evidence is not the last will and testament of the said George L. Switzer, deceased." Or:

(3) If the jury found against the will on the ground of testamentary incapacity, a verdict finding "that George L. Switzer, deceased, at the time he signed the paper writing * * was not of sound and disposing mind and memory and that the paper writing * * is not the last will and testament of the said" deceased. Or:

(4) If the jury found against the will on the grounds of undue influence and testamentary incapacity, a verdict finding that decedent "at the time he signed the paper writing * * was not of sound and disposing mind and memory and that undue influence was exerted on him, and that the paper writing * * is not the last will and testament of the said" deceased.

The jury returned a verdict identical with the form submitted in paragraph numbered (2) supra.

Proponents contend the instruction should have submitted a general form of verdict determining whether the writing involved was or was not the will of the testator. Consult § 473.083(1) (statutory references are to RSMo 1959, V.A.M.S., unless otherwise stated); Civil Rules 71.01, V.A.M.R. (§ 510.220), 71.03 (§ 510.240), and approved instruction in Gittings v. Jeffords, 292 Mo. 678, 239 S.W. 84, 87[1].

■ As stated in Thorne v. Thorne, Mo., 350 S.W.2d 754, 757 [4], a general verdict is a finding by the jury "on all the issues submitted to it." See F. W. Woolworth Co. v. Carriker, 8 Cir., 107 F.2d 689, 692 [1]; J. E. Stewart Produce Co. v. Gamble–Robinson Commission Co., 189 Mo.App. 654, 175 S.W. 319, 320 [1]. The Thorne case, supra [3], states: "It has been stated that the courts will construe a verdict liberally in an effort to ascertain the jury's intent. * * And, of course, the court considers a verdict to see if it can find a reasonably clear intent expressed therein, though

perhaps inartfully expressed." A verdict is generally held to be sufficient if it can be made definite and certain, for instance, by reference to the pleadings or instructions. Baker v. Atkins, Mo.App., 258 S.W.2d 16, 23 [21, 22]; McMonigal v. North Kansas City Development Co., 233 Mo.App. 1040, 129 S.W.2d 75, 84 [19]; McIlvain v. Kavorinos, Mo.App., 212 S.W.2d 85, 89 [7–9], reversed in part on other grounds in 358 Mo. 1153, 219 S.W.2d 349; Cochran v. Jefferson County Lumber Co., Mo.App., 132 S.W.2d 32, 38 [12], and the early case of Muller v. St. Louis Hospital Ass'n, 73 Mo. 242, 244.

■ The issue with respect to Instruction P–16 and the verdict returned thereunder on appeal is whether reversible error was committed. Supreme Court Rule 83.13 (b, c) (formerly § 512.160). Contestants challenged testator's will on the grounds of testamentary incapacity and undue influence. A finding for one of said submitted grounds would invalidate testator's will. The jury invalidated the will because of undue influence. The jury is presumed to follow the court's instructions. When consideration is given Instruction P–16, the logically inescapable conclusion is that the jury found testator was mentally competent and against contestants' submitted ground of mental incapacity; as otherwise, under said instruction, the jury would have returned a verdict in conformity with paragraph numbered (4) of our summary of said instruction.

Proponents, in many instances, do not demonstrate the applicability of their citations to the points made. Newdiger v. Kansas City, Mo.App., 106 S.W.2d 51 [1, 2], cited by proponents, was overruled in 342 Mo. 252, 114 S.W.2d 1047, 1048 [3, 4]. Proponents' cases are not in conflict with our ruling under the record before us. The F. W. Woolworth Co., Muller and Thorne cases, supra; National Cash Register Co. v. Kay, 230 Mo.App. 1046, 93 S.W.2d 260, 264 [9]; Tuttle v. Chostner, Mo.App., 260 S.W. 819 [5–7]; Look v. French, 346 Mo.

972, 144 S.W.2d 128, 133 [18]; Parker's Adm'r v. Moore, 29 Mo. 218.

■ The verdict of the jury, when read in the light of Instruction P–16, is responsive to and disposes of all the issues presented of record.

■■ Was a case made on the issue of undue influence? " 'By "undue influence" is meant such influence as amounts to force, coercion, or overpersuasion, which destroys the free agency and will power of the testator.' * * '[T]he law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved or trusted by testator.' * * '[I]t is not the existence of undue influence but the exercise of it in the execution of the will which invalidates such will.' " Glover v. Bruce, Mo., 265 S.W.2d 346, 353 [5, 7, 9]. Also Baker v. Spears, 357 Mo. 601, 210 S.W.2d 13, 17 [1–4].

■ The testimony of Hadley and Mae warranted a finding of a confidential relationship between testator and them. Wilhoit v. Fite, Mo., 341 S.W.2d 806, 813 [5, 6]. No contention is presented with respect to a greater benefaction passing to said beneficiaries under the will involved. The controverted issue is whether in addition to the existence of said fiduciary relationship and a greater benefaction to said beneficiaries there was evidence, direct or inferential, that said beneficiaries were active in causing or assisted in causing the execution of the will involved. Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772 [4, 6]; Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449 [1–3]; 7 Mo.L.R. 188. "Such activity on the part of the fiduciary-beneficiary may be inferred from facts and circumstances in evidence." Baker v. Spears, supra, 210 S.W.2d 13, 17 [2].

Testator lived in the home of those who allegedly exerted undue influence upon him, placed himself under their care and protection (Fowler v. Fowler, 318 Mo. 1078, 2 S.W.2d 707, 711), and between said parties there existed ties of kinship, affection and close association (Machens v. Machens, Mo., 263 S.W.2d 724, 730). These factors sufficiently establish an opportunity to exercise undue influence. Proponents say showings of "motive and opportunity to exercise undue influence, and an unequal or even unjust result," are not sufficient for a jury issue on undue influence (State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W.2d 360, 363 [3]; McCormack v. Berking, 365 Mo. 913, 290 S.W.2d 145, 151 [8]); and a finding of undue influence cannot rest upon a mere opportunity to influence or upon a mere suspicion (Buckner v. Tuggle, supra; Baker v. Spears, supra; Wright v. Stevens, Mo., 246 S.W.2d 817 [1–5]).

■ We take contestant's favorable evidence as true, disregard proponent's evidence unless it aids contestant, and give contestant, the benefit of every favorable inference legitimately drawn from the whole evidence. Wilhoit v. Fite, Mo., 341 S.W.2d 806 [4].

■ Without detailing all evidence favorable to contestants, we think a jury might infer from testator's age and physical and mental condition in 1958 that he was susceptible to influence; that he was forgetful, his mind wandered and he had difficulty in recognizing persons whom he knew and in carrying on a conversation; that Mae and Hadley caused Mattie and Henry to refrain from visiting testator at their home; that Hadley told testator several times he could not understand why Mattie and Henry treated testator the way they did; that Hadley and Mae, particularly Hadley, did exercise influence over testator to Hadley's advantage and the disadvantage of others, including testator, in the withdrawal of the application placing the land testator rented to Henry in 1957 in the Soil Bank Program upon being informed Henry would receive part of the payment and in distributing the income from P. B. Wald's sublease of testator's land; that Mae drove testator to see about the witnesses and to Benecke's office when testator

first consulted about changing his will; that it was difficult for testator to read and he took the memorandum Benecke prepared home with him that night; that a few days later Hadley and Mae drove testator to Brunswick where Hadley got out and Mae again took testator to arrange for the witnesses and to Benecke's to execute the will; that Mae assisted testator up the steps to Benecke's office on one or both occasions; that, although they knew a new will had been executed, they never mentioned it to Mattie and Henry, and, although they knew testator was seriously ill when they took him to the hospital in 1960, they never notified Mattie or Henry and refused Mattie and Henry permission to visit testator after others informed them of testator's illness, and first permitted them to visit testator a day or two before his death and when he did not recognize anyone and would lapse into a coma.

The submissibility of undue influence is a close issue under the record before us. Proponents' presentation, stressing the evidence favorable to proponents, does not demonstrate that a jury could not properly infer activity on the part of Hadley and Mae in connection with the execution of the will involved, and we are not inclined to overrule the court's submission of undue influence to the jury.

During the cross-examination of Hadley Switzer contestants developed he had purchased a little over $2,000.00 worth of fertilizer in 1960, and, over objections the evidence was irrelevant, that subsequent to testator's death, he had charged against testator's estate $5,900.00 for fertilizer and seed, including purchases in 1961 and 1962. This was admitted on the theory contestants were attacking the witness' credibility. Hadley testified he had the approval of testator's administrator for said purchases. James J. Wheeler, called in rebuttal, testified he was appointed administrator in September, 1960; and, over objections, that the estate received a statement for $2,952.98 in 1961 and later in 1961 a statement for $5,924.98 from the Salisbury Milling Company; that

he did not authorize Hadley to make these charges against the estate, and that the farming operations of the estate did not justify anything like the expense involved.

Evidence in any suit should be relevant; and evidence that throws no light on the controversy should be excluded as it tends to confuse the issues and operate to prejudice a party before the jury. To invalidate a will, undue influence must be directly connected with the execution of the will, must operate at that time, and must destroy the free agency of testator in the execution of the will. Baker v. Spears, supra, 210 S.W.2d 13, 18 [5]. Hadley Switzer's purchase of seed or fertilizer after testator's death in August, 1960, and charging the same against testator's estate is a collateral matter involving the rights of testator's estate against him or the vendors against him or said estate. It does not tend to establish Hadley's exercise of undue influence over testator at the time of the execution of the will of July 31, 1959. Generally a party is bound by the answer of a witness on collateral matters first brought out on cross-examination. Harter v. King, Mo.App., 259 S.W.2d 94 [4]; State v. Bagby, 338 Mo. 951, 93 S.W.2d 241, 248 [11]. Immaterial and incompetent evidence should not be gotten before a jury under the theory it discredits a witness. Hungate v. Hudson, 353 Mo. 944, 185 S.W.2d 646 [10], 157 A.L.R. 598; West v. Sinclair Refining Co., W.D.Mo., 90 F.Supp. 307 [4].

Under testator's leases he agreed to furnish the seed and fertilizer. We are of the opinion that the portion of witness Wheeler's testimony contradicting and discrediting part of Hadley Switzer's testimony on cross-examination related to collateral matters and should have been excluded.

Instructions P–7 and P–9 were verdict directing instructions for contestants; P–7 upon a finding that testator was subject to the domination and control of Hadley or Mae Switzer "or any other person, and that

they or any other person for them, or either of them" exerted undue influence upon testator in the procurement of the will involved, and P–9 upon a finding that said will "was procured by undue influence exerted over [testator] by either one or more of the defendants." Contestants' petition alleged undue influence only on the part of Hadley Switzer and Mae Switzer, and proponents contends this broadening of the issues constituted error.

In Welch v. Welch, 354 Mo. 654, 190 S.W. 2d 936, 938 [12], relied on by contestants, a charge that undue influence was exercised by defendants was held "broad enough to cover undue influence exercised by them through others." That case states "the evidence gives rise to an inference that such was the case."

We have said: "[I]n a will contest, the plaintiff must state the one or more grounds upon which he contests the will * * * and the issues cannot be broadened or extended, either by the admission of evidence or instructions on behalf of plaintiff." Adams v. Kendrick, 321 Mo. 310, 11 S.W.2d 16, 22 [3, 4], holding it was error under a charge that testator had a certain insane delusion to admit evidence or instruct on other insane delusions. This should be particularly so where there is no substantial evidence upon which to base the instruction. See Jackson v. Hardin, 83 Mo. 175, 186 (III) (holding that under allegations that James H. and Ben T. Hardin exercised undue influence over testator, evidence that others also exerted such influence was properly excluded); Fletcher v. Henderson, 333 Mo. 349, 62 S.W.2d 849, 853 [7, 8] (where there was neither pleading nor evidence to support the requested instructions); Gittings v. Jeffords, 292 Mo. 678, 239 S.W. 84, 88 [4].

■■■ Wills are solemn acts, designed to accomplish a testator's last wishes, and should be overturned only on proper and substantial evidence. There is no substantial evidence in this record that Dorothy Davis, Lois Cunningham or Anna Mont-

gomery, the other defendants, exerted any undue influence over testator. The fact that when Lois Cunningham, testator's granddaughter, 26 years old at the time of trial, visited testator he told her about Henry wanting him to divide his property and indicated he was afraid of Henry for some reason was not substantial evidence that she exerted undue influence over testator in connection with his will, and snapshots of testator with some of his infant grandchildren during a Christmas Holiday Season are not substantial evidence that they or any defendant was exerting such influence over testator. There is neither pleading nor evidence of record upon which to base undue influence by any person other than Hadley and Mae Switzer, and said issue respecting them is a close question of fact. Submitting factual issues to a jury implies there is substantial evidence warranting the submitted finding. "An instruction which is not supported by the evidence is erroneous in that it is misleading and confusing." Hart v. Midkiff, Mo., 321 S.W.2d 500, 508 [10]; Adams v. Kendrick, supra, 11 S.W.2d 16, 25 [18]; Fletcher v. Henderson, supra. Under the authorities the giving of Instruction P–9 constituted reversible error. We are also of the view Instruction P–7 should not have been given.

■ The case should be retried and we consider proponents' attack against contestants' Instruction P–10. This instruction, for all purposes here, is a copy of the instruction approved in Mowry v. Norman, 1909, 223 Mo. 463, 475(V), 122 S.W. 724, 728(5), when made to apply to Hadley and Mae Switzer and facts in this record. We need not set it out. It directed a verdict setting aside testator's will upon a mere presumption of undue influence arising from (1) a finding of a confidential relation and (2) the greater benefaction to said fiduciary-beneficiaries, unless such presumption was rebutted by a preponderance of the evidence. This was the law at the time of the Mowry decisions. The second Mowry case, supra, followed the first Mowry opinion, 1907, 204 Mo. 173, 103 S.W. 15 [2], 18,

19, where it is stated: "[I]f plaintiffs show a state of facts which establish a fiduciary relation, or some such similar confidential relation, between the defendant, a principal beneficiary, and the testator, then upon that showing the burden shifts"; and "the law indulges the presumption that undue influence has been used." However, this portion of the Mowry v. Norman opinions and other like holdings were overruled when Missouri adopted the majority rule in Loehr v. Starke, Banc, 1932, 332 Mo. 131, 56 S.W.2d 772, 778 [6]. As pointed out in Pulitzer v. Chapman, Banc, 1935, 337 Mo. 298, 316, 85 S.W.2d 400, 409 [3], court en banc in Loehr v. Starke, supra, 56 S.W.2d 772, 777, "overruled these earlier decisions, and held that such presumption does not arise unless, in addition to proof of the fiduciary relation and of a benefaction to or in the interest of the fiduciary, there be further facts and circumstances in evidence from which it can be inferred that the fiduciary beneficiary was active in some way which caused or assisted in causing the execution of the will." Authorities are collected and reviewed in 3 Maus, Missouri Practice 125, § 132. See Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449, 452 [1]; Fletcher v. Ringo, Mo., 164 S.W.2d 904, 907 [11, 12]; Clark v. Commerce Trust Co., 333 Mo. 243, 62 S.W.2d 874, 881 [10, 11]; State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W.2d 360, 364 [6]; Powell v. Raleigh, Mo.App., 244 S.W.2d 387, 390 [4, 6]; 7 Mo.L.R. 188. Instructions in the Clark and Powell cases, supra, omitting, as does the instant instruction, a finding of activity on the part of the fiduciary, were held reversibly erroneous.

Instruction "(A)" in Clark v. Powell, 351 Mo. 1121, 175 S.W.2d 842, 848 [15, 16], stressed by contestants, required a finding of all essential elements mentioned above, including activity by the fiduciary-beneficiary in the execution of the will.

Instruction P–10 should be redrafted upon a retrial.

Proponents are entitled to hold the verdict in their favor on the issue of testamentary capacity. The judgment is reversed and the cause is remanded for new trial on the issue of undue influence.

PER CURIAM.

The foregoing opinion by WALTER H. BOHLING, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.